NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| TITAN STONE, TILE & MASONRY, INC., : | |
| : | |
| Plaintiff, : | Civ. No. 05-3362  (GEB) |
| v. : | |
| : | **MEMORANDUM OPINION** |
| HUNT CONSTRUCTION GROUP, INC., : | |
| UNITED STATES FIDELITY AND | |
| GUARANTY COMPANY, FIDELITY & : | |
| DEPOSIT COMPANY OF MARYLAND, | |
| AND FEDERAL INSURANCE COMPANY : | |
| : | |
| Defendant. : | |
| HUNT CONSTRUCTION GROUP, INC., : | |
| : | |
| Third-Party Plaintiff, : | |
| v. : | |
| : | |
| INTERNATIONAL FIDELITY INSURANCE | |
| COMPANY, : | |
| : | |
| Third-Party Defendant. : | |

**BROWN, Chief Judge**

This matter comes before the Court upon Defendants Hunt Construction Group Inc.

("Hunt"), United States Fidelity & Guaranty Company, Fidelity & Deposit Company of

Maryland, and Federal Insurance Company's (collectively, "the Sureties") Motion for Partial

Summary Judgment on Counts I, III, and IV of Plaintiff Titan Stone, Tile & Masonry, Inc.'s

("Titan" or "Plaintiff") Second Amended Complaint, Hunt's Motion for Partial Summary

Judgment on Counts V, VII, VIII and IX of Titan's Second Amended Complaint, and the

Sureties' Motion for Partial Summary Judgment on Counts X and XI of the Second Amended

Complaint.  The Court has decided the motions without oral argument pursuant to Federal Rule

of Civil Procedure 78.  For the reasons set forth below, the Court will grant in part and deny in

part Defendants' joint motion, will grant in part and deny in part Hunt's motion and will grant

the Sureties' motion.

## I.    BACKGROUND

Hunt is a construction firm that provides general contracting services in the construction

industry.  (Sec. Am. Compl. ¶ 3; Hunt Answer ¶ 3; Sureties Answer ¶ 3.)  Hunt was hired to

provide the contracting work for the construction of a library (the "Project") on behalf of the

College of New Jersey in Ewing, New Jersey (the "Owner").  (Sec. Am. Compl. ¶ 3; Hunt

Answer ¶ 3; Sureties Answer ¶ 3.)  The terms of the agreement between Hunt and the Owner are

set out in the Prime Contract (the "Prime Contract"). Declaration of Andrew Kobayashi in

Support of Defendants' Joint Motion ("Kobayashi Decl. I") Ex. D.  Following a bidding contest

among potential subcontractors, Hunt entered into a valid and binding Subcontract Agreement

(the "Agreement") with plaintiff Titan on October 13, 2003, whereby Titan would perform

services as a subcontractor on the Project. (Sec. Am. Compl. ¶¶ 4-5; Hunt Answer ¶¶ 4-5.)  In

particular, Titan was hired for work relating to the installation of the exterior panelized wall

system for the project (the "Wall System").  (Sec. Am. Compl. ¶ 5; Hunt Answer ¶ 5.)  Titan now

alleges that Hunt failed, from the very beginning of the Project, to fulfill its obligations under the

Agreement.  (Sec. Am. Compl. ¶¶ 6-7.)

First, Titan claims to have been concerned that the structural drawings upon which Hunt

was relying for the Project were inconsistent with the use of Titan's Wall System.  (Sec. Am.

Compl. ¶¶ 6-8.)  According to Titan's Second Amended Complaint, Titan was assured by Hunt that the Owner's engineer for the project, STV Incorporated ("STV"), would work with Titan and its engineer, Curtin Wall Design & Consulting, Inc. ("Curtin"), to integrate Titan's Wall System into the structure of the building.  (*Id.* at ¶ 8.)  Titan now alleges that these representations were false.  (*Id.*)

In addition, Titan's Second Amended Complaint states that Hunt and STV promised to provide Titan with essential drawings relating to the Project, without which Titan could not begin work on the Wall System.  (*Id.*)  Titan claims that it was not provided the promised drawings at the time they were needed, and in fact did not receive them until July 1, 2004.  (*Id.*)  As a result of this and Hunt's allegedly negligent management of the Project in general, Titan's part of the Project incurred significant delays.  (*Id.* at ¶¶ 8-11.)

Finally,  Titan alleges that Hunt was paid up to $2,000,000 for work performed by Titan, and yet refused to forward those funds to Plaintiff on the grounds that it held Titan responsible for the delays and other problems incurred during the Project.  (*Id.* at ¶¶ 16-17.)  Titan claims that the United States Fidelity and Guaranty Co., Fidelity & Deposit of Maryland, and Federal Insurance Company issued a payment bond (the "Payment Bond") and a performance bond (the "Performance Bond") on July 31, 2003 to assure the payment by Hunt of its obligations to, *inter alia*, the subcontractors, and to assure performance by Hunt of its obligations to the Owner under

3

the Agreement.[1] (*Id.* at ¶¶ 26-31.) Titan also claims that while Hunt promised that it would pay Titan under the Agreement for all the work it performed on the Project – including all extra work resulting from the delays allegedly caused by Hunt, (*id.* at ¶ 14) – Hunt in fact terminated Titan once the Wall System was installed. (*Id.* at ¶ 15.)

On January 22, 2007, this Court dismissed Counts II and VI of Titan's Second Amended Complaint. On January 26, 2007, the Defendants filed their Joint Motion for Partial Summary Judgment ("Def. Br. I"), Hunt filed its Motion for Partial Summary Judgment ("Def. Br. II") and the Sureties filed their Motion for Partial Summary Judgment ("Def. Br. III").

## II.   DISCUSSION

### A.   STANDARD

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Hersh v. Allen Prod. Co.*, 789 F.2d 230, 232 (3d Cir. 1986). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving

---

[1]      The Court notes that the Sureties' motion refers to a single payment bond and a single performance bond. *See* Def. Br. III, at 4. The parties' statements of facts, however, seem to indicate that each Surety issued one payment bond and one performance bond. *See* Sec. Am. Compl. at ¶¶ 26-28; Hunt Answer at ¶¶ 26-28; Sureties Answer at ¶¶ 26-28. For the purpose of these motions, this Court will rely on the moving papers' characterization of the facts.

party for a jury to return a verdict in its favor).  In deciding whether triable issues of fact exist,

the court must view the underlying facts and draw all reasonable inferences in favor of the

non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986); *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995); *Hancock Indus. v. Schaeffer*,

811 F.2d 225, 231 (3d Cir. 1987).

>    **B.    APPLICATION[2]**

>>    **1.    DEFENDANTS' JOINT MOTION FOR PARTIAL SUMMARY**
>>            **JUDGMENT**

>>>    a.    Issue Preclusion

Defendants request that this Court issue a summary judgment that Titan failed to submit a

claim in accordance with Section 34.2 of the Agreement, and is thus barred from asserting its

contractual claims against Defendants.  The Court will deny Defendants' request.

Section 34.2 of the Agreement states, in part:

>    Dispute Resolution: If [Titan] has a dispute with Hunt regarding
>    the application or interpretation of any provision of this
>    [Agreement] or the breach thereof, *[Titan] shall, within ten (10)*
>    *days after such dispute arises, submit its claim, in writing*, to Hunt
>    attaching all supporting documentation . . . . Within thirty (30) days
>    after receiving [Titan's] written claim and all requested
>    documentation and information, Hunt shall respond with its
>    position and proposed resolution of the dispute.  Should [Titan]
>    reject Hunt's proposed resolution, [Titan] shall proceed as

---

[2]    Section 34.1 of the Agreement provides that it "shall be governed by and
construed in accordance with the laws of the State in which the Project is
located." Kobayashi Decl. I Ex. A.  Accordingly, the Court will apply the law of
the State of New Jersey in deciding the Defendants' motions.

5

> described below.  As a condition precedent to initiating any court
> or arbitration proceeding as provided for below, [Titan] must first
> comply fully with the provisions set forth herein . . . .

Kobayashi Decl. I, Ex. A § 34.2 (emphasis added).

Defendants argue that Titan is barred from asserting its contractual counts (Counts I, III

and IV) on the grounds that "Titan failed to submit a claim to Hunt in accordance with Section

34.2 of the [Agreement]," and was not therefore entitled to file this lawsuit to enforce the

Agreement.  Def. Br. I at 21.  Defendants add that "[b]ecause the New Jersey Superior Court

already ruled that Titan did not submit a claim under Section 34.2 of the [Agreement] as part of a

final judgment, that issue is resolved as between Hunt and Titan, and the doctrine of issue

preclusion precludes relitigation" in the case at bar.  *Id.* at 22. Indeed, in permanently enjoining

arbitration of the parties' dispute, the New Jersey Superior Court held in this case that:

> While it is true that Hunt is required by Section 34.3 of the
> [Agreement] to respond to a request to determine the forum within
> ten days, it is also true that all of the provisions of Section 34.2 are
> a condition precedent to Section 34.3.  *Titan did not submit the*
> *dispute to Hunt according to the terms of Section 34.2.*  It simply
> demanded arbitration instead of submitting the dispute along with
> supporting documents according to the [Agreement]. Hunt never
> made any clear or decisive act to waive its rights.  Therefore, Hunt
> still has all rights of selection with regard to selection of a forum.

Declaration of Anne M. Patterson in Support of Defendants' Joint Motion for Summary

Judgment ("Patterson Decl. I") Ex. G, at 6-7 (emphasis added).

Titan responds that "the doctrine of issue preclusion is inapplicable in this case," since

Hunt "affirmatively stated to the State Court and Titan that it wanted to litigate Titan's claims

instead of arbitrate them," and because "[t]he issue of satisfying conditions precedent was never

6

fully litigated before the State Court, and was not essential to the State Court's decision to enjoin the arbitration." Pl. Opp'n at 35.

"The doctrine of issue preclusion . . . derives from the simple principle that later courts should honor the first actual decision of a matter that has been actually litigated." *Burlington N. R.R. v. Hyundai Merchant Marine Co.*, 63 F.3d 1227, 1231 (3d Cir. 1995) (quotations omitted), *quoting* 18 CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 4416 (1981). "The prerequisites for the application of issue preclusion are satisfied when: (1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment." *Burlington*, at 1231-32, *citing In re Graham*, 973 F.2d 1089, 1097 (3d Cir. 1992).

Hunt argued before the New Jersey Superior Court that Titan had no right to arbitration under the Agreement and that the Court should prevent the arbitration initiated by Titan from going forward. Patterson Decl. Ex. G, at 3. Titan, for its part, claimed that the parties were subject to a valid agreement to arbitrate, and that the arbitrator was to decide whether the conditions precedent of Section 34.2 had been met. *Id.*

Reviewing the parties argument, the state court began by considering "whether the court or an arbitrator should decide whether the case should be arbitrated." *Id.* at 5. The court found: (i) that Section 34.2 of the Agreement did not amount to an arbitration agreement, (ii) that the court, rather than an arbitrator, could decide whether the case should be arbitrated, and (iii) that Hunt could not, under the language of the Agreement alone, be forced to arbitrate. *Id.* at 6 ("This

7

is in no way an enforceable arbitration agreement, but rather an agreement which sets forth Hunt's sole right to choose the forum in which a dispute will be heard.").

The court then addressed Titan's claims that Hunt had waived its right to choose the forum by failing to respond to a request to determine the forum within ten days under Section 34.3.  *Id.*  The Court found that since the provisions of Section 34.3 only came into play if the conditions precedent of Section 34.2 had been met, and since Titan had failed to meet those conditions precedent, Hunt could not have found to have waived its right to choose a forum. *Id.* at 6-7.  The court concluded "that there [was] no arbitration agreement and that Hunt ha[d] not triggered anything in the contract that would require submission of th[e] dispute to arbitration." *Id.* at 7.

A careful reading of the state court's opinion thus reveals that the resolution of the issue sought to be precluded here – i.e. whether or not the Agreement's conditions precedent to litigation were met – while touched upon in the court's opinion, was not essential to the state court's ultimate holding.  *See Burlington*, 63 F.3d at 1231-32.  Indeed, the crux of the opinion is that Section 34.3 cannot be interpreted as an arbitration agreement, and that Hunt cannot therefore be compelled under the Agreement to arbitrate.  The court only noted that the conditions precedent of Section 34.2 had not been met in assessing whether Hunt had waived its right to choose the forum for the dispute resolution.

Since the doctrine of issue preclusion does not bar Titan from arguing that it has met the conditions precedent of Section 34.2, *see Nat'l R.R. Passenger Corp. v. Pa. Public Util. Comm'n,* 288 F.3d 519, 527 (3d Cir. 2002) ("[I]n determining whether the issue was essential to

8

the judgment, we must look to whether the issue "was critical to the judgment or merely

dicta.""), *cert. denied* 538 U.S. 1057 (U.S. May 27, 2003) (No. 02-1402), there remains a

genuine issue of material fact as to whether Titan met those conditions precedent, and whether it

is entitled to put forth its contractual claims.  Accordingly, the Court will deny Defendants'

motion for summary judgment on the issue.[3]

> b.   Whether Titan is barred from claiming entitlement to progress
>      payment applications and retainage.

>      i.   Progress Payment Applications

Hunt claims that it is entitled to summary judgment that "Hunt did not commit a breach

of the [Agreement] by failing to pay Titan for payment applications . . . ." Def. Br. I at 24.  The

Court disagrees.

Section 5.2 of the parties' Agreement states, in relevant part:

> Progress Payment Applications: As directed by Hunt, [Titan] shall
> submit to Hunt itemized progress payment applications on forms
> approved by Hunt. [Titan] understands that its progress payment
> applications will be used in Hunt's Applications for Payment to the
> Owner.  Each progress payment application shall show the
> estimated value of work completed for each component part of
> [Titan's] approved Schedule of Values including executed Change
> Orders, the amount of all previous payments and the amount of
> current retainage.

Kobayashi Decl. I Ex. A § 5.2.

---

[3]   In the alternative, this Court concludes that the issue addressed by the state court
is not identical to the one now before the Court.  Indeed, the state court noted that
the Section 34.2 "condition precedent [was] not, as Titan claims, a condition
precedent to arbitration.  It [was] a condition precedent *to Titan having the right
to demand that Hunt choose a forum for the dispute*."  Patterson Decl. Ex. G, at 6.
In the case at bar, by contrast, the question at issue is whether the Agreement's
*conditions precedent to litigation* were met.

9

Defendants argue that "Section 5.2 of the [Agreement] requires Titan to submit a Monthly Statement of Subcontractor to Hunt with every payment application," and that "Titan never submitted these documents for its Payment Applications 14 through 16." Def. Br. I at 25. Defendants conclude that they are therefore entitled to summary judgment that "Hunt did not breach the [Agreement] by failing to pay Titan for Payment Applications 14-16, as they were never properly submitted." *Id.*

Titan responds that Hunt paid Titan's payment applications 1 through 12 in full, but only partially paid payment application 13, and never paid payment applications 14 through 16. Pl. Opp'n at 43. With respect to payment application 13, Titan claims that "Hunt admits that it approved payment application []13 in the amount of $436,108.50 and only paid Titan $25,144.68." *Id.*

As for payment applications 14 through 16, Titan contends that no "Monthly Statement of Contractor" needed to be submitted "until Hunt approved Titan's "pencil" copy payment applications, which Hunt wrongfully refused to do." *Id.* at 44. Indeed, Titan claims that it would prepare a pencil copy of each payment application – essentially, a draft payment application – and forwarded it to Hunt. Hunt would then either approve it or suggest changes to the draft application. *Id.* Once the pencil copy was approved, Titan prepared a final copy of the payment application, which it sent to Hunt for processing. *Id.*

Titan submits that "Hunt never approved Titan's pencil copies for payment applications [14 through 16]" and Titan was therefore "never required to complete a "[Monthly] Statement of Subcontractor" form in connection with any of these payment applications." *Id.* Titan concludes

10

that Hunt's failure to approve or respond to Titan's pencil copies was a breach of Hunt's implied duty of good faith and fair dealing under the Agreement, and argues that Hunt should not be allowed to rely on its own bad faith conduct to evade its payment responsibilities under the Agreement. *Id.* at 45.

The courts of the state of New Jersey have consistently held that "[e]very party to a contract . . . is bound by a duty of good faith and fair dealing in both the performance and enforcement of the contract." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210, 224 (2005), *citing Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 241, 244 (2001) (holding that "[a] covenant of good faith and fair dealing is implied in every contract . . ."); *see also Sons of Thunder v. Borden, Inc.*, 148 N.J. 396, 420 (1997) ("[E]very contract in New Jersey contains an implied covenant of good faith and fair dealing"); Restatement (Second) of Contracts § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."). "The party claiming a breach of the covenant of good faith and fair dealing must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." *Brunswick Hills*, at 225 (quotations omitted), *quoting* 23 WILLISTON ON CONTRACTS § 63.22 at 513-14 (Lord ed. 2002). "As a general rule, subterfuges and evasions in the performance of a contract violate the covenant of good faith and fair dealing even though the actor believes his conduct to be justified." *Brunswick Hills*, at 225 (quotations omitted), *quoting* RESTATEMENT (SECOND) OF CONTRACTS, § 205 cmt. d (1981).

In the case at bar, and viewing all evidence in the light most favorable to non-movant,

11

there remains a genuine issue of material fact as to whether Hunt's alleged failure to approve or

even acknowledge Titan's pencil copies of the payment applications 14 through 16 – in violation

of the practice adopted by the parties in connection with all prior payment applications –

constitutes a breach of the implied covenant of good faith and fair dealing under the Agreement

and thus, whether it relieves Titan of its obligation to send Hunt Monthly Statements of

Contractor. Accordingly, the Court will deny Defendants' motion for summary judgment that

Hunt did not breach the Agreement by failing to pay Titan for payment applications.

ii.      Retainage.

Hunt claims that it is entitled to summary judgment that "Titan is not entitled to retainage

because the Owner has not released retainage to Hunt, and the Owner's payment is an express

condition precedent to Hunt's obligation to make final payment to Titan." Def. Br. I at 26.

Section 5.9 of the Agreement states, in part:

> Final Payment, consisting of the unpaid balance of the
> [Agreement] Price, shall be made only after all of the following
> events have occurred . . .
>
> (g) Final Payment by Owner to Hunt for [Titan's] Work.  Final
> Payment by the Owner to Hunt shall be an express condition
> precedent to Hunt's duty to make Final Payment to [Titan].

Kobayashi Decl. I Ex. A § 5.9.

Hunt claims that, since "the Owner has not yet made final payment to Hunt," "Hunt has

no obligation[, under Section 5.9 of the Agreement,] to make final payment to Titan . . . ." Def.

Br. I at 26.  Hunt adds that its argument is further buttressed by Section 4.2 of the Agreement,

entitled "Risk of Non-Payment by Owner," which provides that:

12

> Receipt of payment by Hunt from the Owner is a condition
> precedent:
>
> (a) to the right of [Titan] to receive payment from Hunt, unless the
> failure to have received payment from the Owner shall have been
> caused solely by the fault of Hunt; and
>
> (b) to [Titan's] right to make any claims against Hunt's payment
> bond, if a payment bond is posted for the Project.

Kobayashi Decl. I Ex. A § 4.2. Hunt contends that these provisions demonstrate that the risk of

non-collection from Owner should be shifted to Titan. Def. Reply at 24.

In response, Titan contends that Section 5.9 of the Agreement is a "pay-if-paid" clause,

and that the section cannot, under New Jersey law, be read as an agreement between Titan and

Hunt to shift the risk of non-collection to Titan. Pl. Opp'n at 48.  Titan concludes that "Hunt

cannot [therefore] indefinitely postpone payment of [the requested funds] to Titan." *Id.*

A prior decision in this Court, *Seal Tite Corp. v. Ehret, Inc.*, 589 F. Supp. 701 (D.N.J.

1984), adopted the reasoning of the Sixth Circuit court in *Dyer v. Bishop Int'l Eng'g Co.*, 303

F.2d 655 (6th Cir. 1962), and held that when the risk of non-payment was not specifically

assigned in the contract at issue, the pay-if-paid clause was "merely a provision designed to

postpone payment for a reasonable period of time after the work was completed, during which

the general contractor would be afforded the opportunity of procuring from the owner the funds

necessary to pay the subcontractor." *Seal Tite*, at 704 (quotations omitted), *quoting Dyer*, at 660-

61. The Court emphasized then that its holding hinged on the absence of any explicit indication

in the agreement that the subcontractor had agreed to assume the risk of non-payment by the

13

owner. *Seal Tite*, at 704.[4]

Reviewing all evidence in the light most favorable to non-movant, this Court concludes

that there remains a genuine issue of material fact as to whether any provision of the Agreement

constitutes a clear indication that Titan and Hunt had agreed that the collection risk would shift to

Titan. It necessarily follows that there remains an issue of fact as to whether the pay-if-paid

provision of Section 4.2 should be read (i) to absolve Hunt of any obligation to pay retainage to

Titan until Hunt recovers the corresponding funds from the Owner, or (ii) to merely provide Hunt

with reasonable time to pay Titan for its work on the Project in case of non-payment by the

Owner. The Court will deny Defendants' motion for summary judgment that Titan is not entitled

to retainage.

---

[4]    The New Jersey Superior Court's decision in *Avon Bros. Inc. v. Tom Martin
       Const. Co.*, No. 740-99T1, 2000 WL 34241102, at *7 (N.J. Super. Ct. Law Div.
       2000) is consistent with – and in fact relies heavily upon – the decision in *Seal
       Tite*. Indeed, the state court held that:

       > [i]f a subcontractor is to undertake the collection risk, contrary to the usual
       > allocation of risks among the parties to a construction contract, the
       > undertaking must appear in clear and unequivocal language in the
       > subcontract.
       > . . .
       > Nothing in the contract itself, or anywhere in the record before us,
       > evidences the parties' intention to shift the collection risk to Avon. We
       > adopt the reasoning of the Sixth Circuit, followed in *Seal Tite*, and held
       > [sic] that the pay-when-paid clause in Avon's contract merely permits
       > reasonable postponement of the general contractor's payment obligation.
       > In other words, the pay-when-paid language refers to the timing of
       > payment to the subcontractor and not the subcontractor's right to payment.

       *Avon*, at *7.

14

        c.      Whether Titan waived its overhead and extra work claims when it
executed monthly releases.

Defendants argue that "the Court should . . . rule as a matter of law that Titan is not

entitled to the amounts it [seeks] for extended home office overhead and extra work because

Titan waived those claims when it executed Monthly Releases during the Project." Def. Br. I at

26. The Court will deny Defendants' request.

The monthly releases at issue stated, in relevant part:

> In consideration of the amounts and sums received, the
> undersigned does hereby waive and release to the Owner and to
> Hunt Construction Group, Inc. any and all claims and liens and
> rights to liens upon the premises described below . . . and upon
> improvements now thereon, and upon the monies or other
> considerations (due as of the date of the aforesaid payment
> application or invoices from the Owner or Hunt Construction
> Group, Inc., or from any other person, firm or corporation), said
> claims and liens and rights to liens being on account of labor,
> services, materials, fixtures or apparatus heretofore furnished by or
> at the request of the undersigned. . . .
>
> In addition, for and in consideration of the amounts and sums
> received, the undersigned hereby waives, releases and relinquishes
> any and all claims, rights or causes of action whatsoever arising out
> of or in the course of the work performed on the above-mentioned
> project, contract or event transpiring prior to the date hereof,
> excepting the right to receive payment for work performed and
> properly completed and retainage, if any, after the date of the
> above-mentioned application or invoices.

Kobayashi Decl. I Ex. M.

Defendants argue that "[t]he plain language included in each Monthly Release waived

and released all claims of any nature that arose before each was submitted." Def. Br. at 26.  In

particular, Defendants claim that the February 3, 2005 Release signed by Titan "exculpates Hunt

15

and its Sureties from liability for any costs associated with work performed before that date, other than retainage." *Id.* at 27. Defendants conclude that "Titan waived the following claims when it executed a Monthly Release on February 3, 2005: (1) extended home office overhead of $389,746; (2) extra work allegedly performed by CDC in the amount of $50,993.75; and (3) requested change orders in Payment Requisition 16 in the amount of $382,170." *Id.* at 30.

Titan, on the other hand, claims that the Monthly Release form did not apply to Titan's claims for extra work and overhead. Pl. Opp'n at 49. Indeed, Titan submits that "[t]he Monthly Release Form, although executed on February 3, 2005, specifically relate[d] to work performed by Titan up to November 18, 2004, work that was included in Titan's payment application #12." *Id.* at 50. Titan goes on to claim that the Monthly Release expressly excluded "work performed and properly completed and retainage, if any, after the date of the above-mentioned payment application" – i.e., payment application #12. *Id.* Titan concludes that "[n]one of the extra work being sought by Titan was billed to Hunt in Titan's payment application #12," and that the February 2005 Monthly Release "does not bar Titan's claims for extra work that were not billed as part of that payment application." *Id.* at 51-52.

Viewing all evidence in the light most favorable to non-movant, this Court concludes that there remains a genuine issue of material fact as to whether the waiver provision of the February 2005 Monthly Release should be read to waive all existing claims against Hunt as of the date of execution of the Release, or only claims arising prior to Application for Payment #12. Accordingly, the Court will deny Defendants' motion for summary judgment on the issue.

16

        d.      Whether the plain language of the Subcontract bars Titan's claims for home office overhead and extra work.

        i.      Office overhead

Defendants argue that "[t]he Court should . . . rule as a matter of law that Titan is not entitled to its claim for $389,746 in alleged extended home office overhead on the . . . ground that the plain terms of the Subcontract exclude such claim [sic]." Def. Br. I at 30. The Court will grant Defendants' motion on the issue.

Section 10 of the Agreement addresses the issue of liability for project delays. Section 10.1 provides, in part, that:

> Hunt shall not be liable to [Titan] for any delay, disruption or interference to [Titan's] Work *caused by the act, omission, neglect or default of the Owner or the Designer or their respective . . . subcontractors or any other cause beyond Hunt's direct control*; provided, however, Hunt will cooperate with [Titan] in submitting against the Owner or Designer, any just claim arising therefrom which is permitted by the Contract Documents and applicable law. [Titan] shall reimburse Hunt for all reasonable expenses incurred by Hunt in submitting any such claims on behalf of [Titan]. [Titan] shall not claim any time extension, cost reimbursement, compensation or damages for any delay, disruption or interference to the Work except to the extent that Hunt it entitled to a corresponding time extension, cost reimbursement, compensation or damages from the Owner . . . under the Contract Documents and applicable law.

Kobayashi Decl. A § 10.1 (emphasis added).   Section 10.2 further provides that:

> [s]hould [Titan's] Work be delayed, disrupted or interfered with *solely as a result of acts or omissions of Hunt or anyone employed by Hunt on the Project*, then, at Hunt's sole discretion, Hunt shall provide [Titan] either:
>
> (a) an extension of time for completion of the Work equal to the actual impact of the delay, disruption or interference on the critical

17

path of [Titan's] Work, or

(b) additional compensation as provided in Section 9.7(a), but only if a written claim for delay is submitted to Hunt within forty-eight (48) hours from the time of the commencement of such delay, disruption or interference.

Failure to provide such written claim within the prescribed time period shall result in an irrevocable waiver of any such claim. The extension of time or the additional compensation provided pursuant to this Section 10.2 shall be the sole and exclusive remedy that [Titan] shall have against Hunt for delays, disruptions or interferences caused by the acts or omissions of Hunt or anyone employed by Hunt on the Project, and [Titan] shall have no right or entitlement to additional compensation, whether direct or indirect, for such delays, disruptions or interferences. *[Titan] expressly waives the right to bring against Hunt any claim for damage for . . . extended overhead . . . .*

Kobayashi Decl. I Ex. A § 10.2 (emphases added). Defendants claim that Titan is barred from

setting forth its claim for home office overhead expenses under either of these Agreement

provisions. Def. Br. I at 30-31.

Titan responds that Section 10.2 compels Hunt to provide the subcontractor with an

extension of time or additional compensation if Hunt delays the subcontractor's work. Pl. Opp'n

at 58. It claims that only when additional time is so provided does the subcontractor waive its

right to additional compensation. *Id.* at 59. Titan argues that Hunt failed to provide Titan with

either additional time to perform the project or additional compensation, *id.,* and concludes that

"there was no consideration provided by Hunt for a waiver of Titan's claims" and that "Titan

[therefore] did not waive its right to additional compensation for damages arising out of Hunt's

delays and disruptions of Titan's work." *Id.* at 59-60.

As a threshold matter, the Court finds Section 10.1 inapplicable as it concerns only delays

18

caused by entities other than Hunt.  With regards to Section 10.2 of the Agreement, the Court

finds that Titan has offered no evidence that it has submitted "a written claim for delay . . . within

forty-eight (48) hours from the time of the commencement of [the] delay, disruption or

interference." *See* Kobayashi Decl. Ex. A § 10.2.[5]  Accordingly, even viewing all evidence in the

light most favorable to the non-movant, the Court is compelled to find that Titan has waived its

right for home office overhead under Section 10.2.[6] The Court will therefore grant Plaintiff's

motion for summary judgment on the issue.[7]

ii.      Extra work

Defendants argue that they are entitled to summary judgment that Titan's claims for extra

work are barred by the plain language of the Subcontract.  Def. Br. I at 33.  The Court will deny

---

[5]    Hunt would have this Court interpret Section 10.2 to bar any claim for extended overhead resulting from delays it may have caused, *regardless of whether or not Titan filed a claim*.  Titan, on the other hand, contends that such claims are barred under the Agreement only in the event that no written claim has been filed.  That dispute is moot given this Court's finding that Titan has waived its right to additional compensation under Section 10.2 under the narrower interpretation of the provision.

[6]     The Court finds unavailing Plaintiff's argument that "there was never any valuable consideration provided by Hunt to support . . . a waiver [of Titan's claims for compensation]."  Def. Br. I at 59-60.  As the New Jersey Court of Error and Appeals held in *Peterson v. Reid*, 80 N.J. Eq. 450 (1912), "it [i]s the promise itself and not the performance of that promise that constitute[s] the consideration."  *Id.* at 455; *see also Rothman Realty Corp. v. MacLain*, 21 N.J. Super. 172, 174 ("It is then the promise, and not the performance thereof, that constitutes the consideration, except where, by the terms or necessary intendment of an agreement, performance on the one side is made a condition precedent to performance on the other."), *citing U. & G. Rubber Mfg. Co. v. Conard*, 80 N.L.J. 286 (N.J. 1910).

[7]    Accordingly, this Court need not decide whether Titan's revised damage calculation was untimely and therefore inadmissible.

19

Defendants' motion on the issue.

Section 18.3 of the Agreement states as follows:

> Price and Time Changes Valid Only by Written Change Order: The
> Subcontract Price and time for completion will not be changed
> except upon written Change Order from Hunt. Changes in the
> Subcontract Price shall not be included in Subcontractor's payment
> applications until a written Change Order has been fully executed
> by Hunt incorporating the price change into the Subcontract Price.

Kobayashi Decl. I Ex. A § 18.3.

Defendants claim that "[e]ven if Titan had not waived its claims for extra work and

Requested Change Orders when Titan executed Monthly Releases, partial summary judgment in

favor of Hunt and its Sureties would still be appropriate on the independent ground that those

claims are barred by the plain language of [Section 18.3.]" Def. Br. I at 33. Defendants contend

that Titan "never executed change orders for Titan's claims for . . . extra work allegedly

performed by CDC or for Titan's claims for $382,170 in requested change orders." *Id.* at 34.[8]

Defendants add that even assuming – for the sake of argument only – that Hunt had ordered Titan

to perform extra work in exchange for additional compensation, Section 18.3 would require Titan

to submit a claim in accordance with Section 21 of the contract to gain the right to additional

compensation.[9] *Id.* Defendants argue that Titan's alleged failure to submit such claims in

---

[8]     The Court notes that Defendants withdrew their argument insofar as it related to
        Request for Change Order ("RCO") 10 and 16, "because the work described in
        them has actually performed [sic] and Titan is entitled to a credit for its costs,
        though not as much as it seeks." Def. Reply at 20.

[9]     Section 21.5 of the Agreement states, in part:

        > With respect to any claim submitted by [Titan] under this Section 21,
        > [Titan] shall prepare the claim in writing and a format acceptable to Hunt.

writing led to the waiver of Titan's claims under Section 21.4 of the Agreement. *Id.* at 35.[10]

In response, Titan argues that it complied fully with the provisions of Section 18, but that Hunt did not. Titan alleges that Hunt requested that Titan complete the additional work referenced in the RCOs at issue. Pl. Opp'n at 61. Titan contends that it "submitted written notices to Hunt identifying the costs associated with the additional work" in compliance with Section 18.2. *Id.* Titan submits however that Hunt failed to execute corresponding Change Orders, in violation of the Agreement and the implied covenant of good faith and fair dealing, and that Hunt cannot argue that Titan should have submitted a claim under Section 21 since Hunt never notified Titan that it disputed the RCOs. *Id.* In the alternative, Titan argues that even if Section 21 were applicable, the RCOs it sent to Hunt contained all the information required under Section 21.5 of the Agreement, and its claims cannot therefore be deemed barred under Section 18.

Viewing all evidence in the light most favorable to the non-movant, this Court concludes

---

> At a minimum, the claim shall include detailed information concerning the alleged claim-causing event, [Titan's] damages which allegedly resulted from the event, how the event allegedly caused such damages, and steps allegedly taken by [Titan] to mitigate the extent of its alleged damages.

Kobayashi Decl. I Ex. A § 21.5.

[10]   Section 21.4 of the Agreement provides, in part:

> Failure by [Titan] to deliver any claim for alleged damages to Hunt within the time limits set forth in this Section 21 and/or provide the required damage amounts and other specific information and supporting documentation shall constitute a waiver and estoppel of [Titan's] rights with respect to such claim for alleged damages.

Kobayashi Decl. I Ex. A § 21.4.

that there remains a genuine issue of material fact as to whether Titan complied with the

provisions of Sections 18 and 21 of the Agreement, and thus, whether it is entitled to set forth its

claims for extra work. Accordingly, this Court will deny Defendants' motion for summary

judgment on the issue.

### 2. HUNT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

   a.   Whether the existence of an allegedly valid and enforceable
        contract bars Titan's Equitable claims.

Hunt contends that it is entitled to summary judgment that Titan's equitable claims are

barred by the existence of a valid agreement between the parties. This Court agrees.

Courts in this Circuit have established the general rule that the existence of a valid

contract is a bar to recovery under equitable remedial theories. *See Van Orman v. Am. Ins. Co.*,

680 F.2d 301, 311 (3d Cir. 1982) ("[W]e believe that New Jersey courts regard the existence of a

valid contract as a bar to recovery under [equitable] theor[ies]."); *Suburban Transfer Service,*

*Inc. v. Beech Holdings, Inc.*, 716 F.2d 220, 226-27 (3d Cir. 1983) ("Quasi-contract liability will

not be imposed, however, if an express contract exists concerning the identical subject matter.

The parties are bound by their agreement, and there is no ground for implying a promise as long

as a valid unrescinded contract governs the rights of the parties."), *citing, inter alia, C.B. Snyder*

*Realty Co. v. Nat'l Newark & Essex Banking Co.*, 14 N.J. 146, 163 (1953).

Relying on the rule set out in *Van Orman*, Hunt claims that since "there is a valid and

binding Subcontract Agreement, Titan has adequate remedies at law and no legal basis on which

to pursue equitable claims." Def. Br. II, at 15. Hunt concludes that the Court should dismiss

Titan's equitable and quasi-contractual counts. *Id.* at 16.

22

Titan responds that when it "commenced work on the Project in October 2003, there was

no executed [Agreement]." Pl. Opp'n at 63. Titan adds that the Agreement was only signed in

June 2004, but that Hunt breached it shortly thereafter by "delaying and interfering with Titan's

work, constructively accelerating Titan's work, and failing to pay Titan for its work." *Id.* at 63-

64. Titan contends that "[w]hen Hunt's breach occurred, Titan no longer had an obligation to

perform under the [Agreement]," *id.* at 64, *citing Nolan by Nolan v. Lee Ho*, 120 N.J. 465, 472

(1990), but "continued to perform work at the Project based on Hunt's repeated promises,

verbally and in writing, to pay Titan for its work." Pl. Opp'n at 64. Titan concludes that much of

the work it performed on the Project was completed independently of the Agreement, as the

Agreement had been breached by Hunt. *Id.*

Even drawing all inferences in the light most favorable to non-movant, this Court

concludes that there is no genuine issue of material fact that the work performed by Titan on the

Project was governed by the Agreement – a contract whose validity neither party disputes. The

existence of that valid contract bars Titan's equitable claims. *See Van Orman*, 680 F.2d at 311.

The Court will therefore grant Hunt's motion for summary judgment on the issue.

> b.     Whether Titan has Adequately Plead its Claim of Violation of the
>        New Jersey Trust Fund Act.

Under the New Jersey Trust Fund Act:

> All money paid by the state of New Jersey . . . to any person
> pursuant to the provisions of any contract for any public
> improvement made between any such person and the state or any
> agency, commission or department thereof, or any county,
> municipality or school district in the state, shall constitute a trust
> fund in the hands of such person as such contractor, until all claims
> for labor, materials and other charges incurred in connection with

23

the performance of such contract shall have been fully paid.

N.J.S.A. § 2A:44-148. "This act, commonly known as the Trust Fund Act, protects those who

have claims for labor, material and other charges incurred in fulfilling the contract between the

governmental body and its contractor." *Montefusco Excavating & Contractor Co. v. County of*

*Middlesex*, 82 N.J. 519, 525 (1980). "Thus, money paid by the government to a public contractor

constitutes a trust fund for its laborers and materialmen." *Id.* "When a contractor's surety has

paid the contractor's indebtedness to the laborer or materialman, the surety may pursue the

remedies of the laborer or materialman by proceeding against the funds paid to the contractor."

*Id, citing Graybar Elec. Co. v. Manuf. Casualty Co.*, 37 N.J. Super. 284 (N.J. Super. Ct. Law

Div. 1955).

Hunt argues that Titan cannot produce sufficient evidence to suggest that it is entitled to

further payment from Hunt for charges incurred for labor and materials. Def. Br. II at 22. In

addition, Hunt claims that "Titan must be able to show that Hunt has received in trust a certain

amount of money from the Owner that was not distributed to the [other] subcontractors." *Id.*

Titan responds that it has in fact offered significant evidence proving that it is entitled to

further payment from Hunt for charges incurred during the Project, and points in particular to

Hunt's alleged admission that it still owed Titan $410,963.82 in connection with its payment

application No. 13. Pl. Opp'n at 71. Titan adds that it has no obligation under the law to

establish that the money to which it claims to be entitled has not been forwarded to other parties,

including other subcontractors on the project. It concludes: "[t]he fact that Hunt may have used

the money to pay its obligations to other subcontractors on the Project does not alter the trust

fund character of the money." *Id.*

The Court concludes that Titan has raised a genuine issue of material fact as to whether it is owed funds from Hunt for charges incurred during the project. As to Hunt's assertion that Titan has failed to establish that Hunt is still in possession of the funds requested by Titan, the Court finds the argument unavailing. Indeed, the Supreme Court of New Jersey held in *Hiller* that:

> If the payor is under a duty to a third person to devote money paid by him to the discharge of a particular debt the payment must be so applied if the creditor knows, or has reason to know, of the payor's duty, in spite of the fact that the payor directs that the payment shall be applied to the discharge of another debt. The creditor's power, when the debtor gives no direction, is similarly limited . . . the creditor cannot apply the payment to the exclusion of a claim, failure to discharge which, with the money then paid, will, as the creditor knows or has reason to know, violate a duty owed by the debtor to a third person, whether that duty arises from a fiduciary relation or from a contract.

*Hiller & Skoglund, Inc. v. Atl. Creosoting Co.*, 40 N.J. 6, 10 (1963) (quotations omitted), *quoting* Restatement, Contracts §§ 388-89; *see also Nat'l Surety Corp. v. Barth*, 11 N.J. 506, 514 (1953) ("Upon general principles of law, a fund raised for a specific purpose, and placed in the hands of an officer for such specific purpose, cannot lawfully be applied to any other. Any such other appropriation would be a violation of the trust, and so contrary to law."), *quoting Fidelity & Deposit Co. of Maryland v. McClintic-Marshall Corp.*, 115 N.J. Eq. 470 (Ch. 1934); *Craft v. Stevenson Lumber Yard, Inc.*, 179 N.J. 56, 75 (2004) ("When . . . the creditor knows or should know that a debtor is under an obligation to a third party to devote a relevant payment to discharge a duty the debtor owes to the third party, the payment must be applied to do so

regardless of the debtor's instruction or lack thereof."); *Reliance Ins. Co. v. Lott Group, Inc.*, 370 N.J. Super. 563, 575-578 (N.J. Super. Ct. App. Div. 2004) (While consultant was neither agent or employee of contractor, consultant knew that the funds he received from contractor were derived from construction work under a public contract. Those funds were, accordingly, subject to the protection of N.J. Stat. Ann. 2A:44-148.).

Under the New Jersey courts' interpretation of the scope of N.J. State Ann. 2A:44-148, all subcontractors on the project would know that the funds received from the owner constituted compensation for work performed in connection with a state project. As a result, those funds would be subject to protection under the statute.   Hunt would therefore be liable to Titan even if the funds to which Titan was entitled had been forwarded to another subcontractor. Accordingly, the Court will deny Hunt's motion for summary judgment on Count IX of Plaintiff's Second Amended Complaint.[11]

### 3.   THE SURETIES' MOTION FOR PARTIAL SUMMARY

---

[11]   The cases relied upon by Defendants are in fact consistent with Plaintiff's contention that funds provided to Owner for Titan's work and then transferred to other subcontractors would, in this case, be accorded trust fund status. *See D&K Landscaping v. Great American Ins. Co.*, 191 N.J. Super. 448 (N.J. Super. Ct. App. Div. 1983) ("If defendant, as a trustee, breached its obligations to plaintiff as a known creditor of the prime contractor, it may be held liable as a defaulting trustee."); *American Lumberman's Mutual Casualty Co. of Ill. v. Bradley Constr. Co.*, 129 N.J. Eq. 278 (E.&A. 1941) (affirming Vice-Chancellor's ruling that "public moneys in the hands of the contractor were trust funds but when deposited with third parties *who had no notice thereof* these moneys were free of the trust once they were deposited with other moneys in the general bank account of the contractor.") (emphasis added).

**JUDGMENT**

      a.      Whether Titan is barred from asserting its claim on the Payment Bond on the grounds that it failed to wait ninety days before it filed suit against Hunt's Sureties.

The Sureties argue that Titan has failed to wait ninety days before it filed suit against them, and that Titan is therefore statutorily barred from asserting its claim on the Payment Bond. The Court will grant the Sureties' motion for summary judgment on the issue.

The New Jersey Bond Act, provides, in relevant part, that:

> No action shall be brought against any of the sureties on the bond required by this article until the expiration of 90 days after provision to the sureties and the contractor of the statement of the amount due to him, but in no event later than one year from the last date upon which such beneficiary shall have performed actual work or delivered materials to the project.

N.J. Stat. § 2A:44-145.

The Sureties claim that "Titan amended its complaint against Hunt to include Hunt's three Sureties as defendants on March 20, 2006, only 87 days after providing notice of its claim." Def. Br. III at 10. The Sureties add that "Titan cannot cure this defect by re-filing now," as "Titan's last date of work on the Project was March 27, 2005 . . . and the last date it could have sued Hunt's Sureties was March 27, 2006." *Id.* at 10-11. They conclude that Titan "has failed to fulfill an essential condition precedent to its claim against Hunt's payment bond." *Id.* at 11.

Titan responds that it has in fact satisfied the *purpose* of N.J.S.A. § 2A:44-145 because the Act merely "provides a waiting period, which when viewed in the context of the statute as a whole is designed to allow the parties to investigate and potentially resolve a claim on the bond

27

prior to formal legal proceedings." Pl. Opp'n at 75.  Titan adds that the statute should not be found to bar its claims because the Sureties "have not been harmed as a result of the timing of Titan's Complaint." *Id.*  Finally, Titan appears to argue that it had to file its claims against the Sureties when it did because it only had a short window of time – between the 90 day limit and the one year limit set out in N.J. Stat. Ann. § 2A:44-145 – to do so.  *Id.* at 75-76.

The Court finds Titan's arguments unavailing.  The time restrictions set out in N.J. Stat. Ann. § 2A:44-145 are clear and unambiguous, and must be applied strictly.  *See Samuel Braen's Sons v. Fondo*, 52 N.J. Super. 188, 192 (N.J. Super. Ct. App. Div. 1958) (court strictly enforcing N.J. Stat. Ann. § 2A:44-145 time limitation, holding that "[t]he fact that in the particular case before us the public body may suffer no injury by allowing the action to go forward against the surety is of no consequence."); *see also United States v. Johnson*, 529 U.S. 53, 59 (2000) ("Absent ambiguity, the rule of lenity is not applicable to guide statutory interpretation."); *see also Appalachian States Low-Level Radioactive Waste Comm'n v. Pena*, 126 F.3d 193, 198 (3d Cir. 1997) ("The disputed language in the Act is not ambiguous. Thus, our statutory interpretation is at an end . . ."), *citing Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).  This Court need not decide whether a flexible application of the deadlines may be called for in case of conflict between the 90-day and the one-year time restrictions, as Titan admits that it was aware of them at the time of filing and had the opportunity to file its claims in compliance with both.

The Court therefore concludes that there is no genuine issue of material fact that Claim X of Titan's Second Amended Complaint is barred under N.J. Stat. Ann. § 2A:44-145.

Accordingly, the Court will grant the Sureties' motion for summary judgment on the issue.

> b. Whether Titan has any rights to enforce under the Performance Bond.

The Sureties contend that Titan cannot be deemed a beneficiary under the Performance

Bond, and therefore cannot set forth its claim under Count XI. The Court agrees, and will

dismiss that Count.

The Court notes that the Prime Contract between Hunt and the Owner compels Hunt to

produce a payment bond and a performance bond:

> The successful bidder shall furnish within ten (10) calendar days after notice of award a performance bond in statutory form in an amount equal to one hundred percent (100%) of the total contract price as security for the faithful performance of this contract *and also* a payment bond, in statutory form in amount equal to one hundred percent (100%) of the contract price as security for the payment of all persons and firms performing labor and furnishing materials in connection with this contract.

Def. Br. III at 13, *quoting* Kobayashi Decl. I Ex. D (emphasis added). In compliance with the

Prime Contract, Hunt provided the Owner with a Performance Bond backed by the Sureties. The

Performance Bond in effect constituted a guarantee by Hunt to the Owner that the work on the

Project would be completed, and that the Sureties would assume Hunt's performance obligations

in case of default by Hunt. The Performance Bond stated, in part:

> . . . [W]e, the undersigned Hunt Construction Group, Inc. . . . as Principal, and [the Sureties] . . . are hereby held and firmly bound unto the College of New Jersey . . .
> NOW, if the said Hunt Construction Group, Inc. shall well and faithfully do and perform the things agreed by Hunt Construction Group, Inc. to be done and performed according to the terms of the

> said contract, then this obligation shall be void, otherwise the same
> shall remain in full force and effect . . . .

Def. Br. III at 13, *quoting* Kobayashi Decl. Ex. F.  Hunt also provided the Owner with a Payment

Bond, backed by the Sureties.  The Payment Bond constituted a guarantee that Hunt would pay

all subcontractors for work performed on the Project, and that the Sureties would assume its

payment responsibilities with respect to the subcontractors in case of default by Hunt. The

Payment Bond stated, in part, that:

> NOW, if the said Hunt Construction Group, Inc. shall pay all
> lawful claims of subcontractors . . . we agreeing and assenting that
> this undertaking shall be for the benefit of any subcontractor . . . as
> well as for the obligee herein; then this obligation shall be void;
> otherwise the same shall remain in full force and effect . . . .

Def. Br. III at 14, *quoting* Kobayashi Decl. Ex. E.

The Sureties claim that "[a P]erformance [B]ond is intended to guarantee to the Owner

the completion of the construction contract if the contractor were to default, and as such

contemplates the *Owner as the bond's sole beneficiary or obligee*."  Def. Br. III at 12 (emphasis

added).  In contrast, they contend, "the [P]ayment [B]ond is for the purpose of ensuring that

subcontractors and suppliers are properly paid," and accordingly includes subcontractors as

potential beneficiaries of the bond.  *Id.*

Turning to the language of the Prime Contract, the Sureties argue that it "states explicitly

that [it] does not create contractual relationships between the Owner and Hunt's subcontractors,

and further recites that there are no third party beneficiaries to the contract between the Owner

and Hunt."  *Id.* at 15.  The Sureties caution that the Prime Contract's language indicating that the

Performance Bond would stand "as security for the faithful performance of this contract" should not be read to include the performance of Hunt's financial obligations to its subcontractors, especially since the Prime Contract also references a payment bond to be submitted for that very purpose.

Analyzing lastly the language of the Performance and Payment Bonds, the Sureties contend that the explicit inclusion of the subcontractors as potential beneficiaries under the Payment Bond, contrasted with the Performance Bond's failure to list subcontractors as third-party beneficiaries, proves that Titan has no rights to enforce under the Performance Bond. *Id.* at 13-14. They assert that, had the parties to the Performance Bond intended for subcontractors to be potential third-party beneficiaries under the Bond, the Performance Bond would provide so expressly.

In response, Titan argues that "[c]ontrary to the Sureties' contention, the Performance Bond does not explicitly exclude third-party beneficiaries." Pl. Opp'n at 77. Titan infers that it should therefore be deemed to be such a beneficiary of the Performance Bond. Titan concludes that under the Performance Bond, "if Hunt does not satisfy all of its obligations set forth in the Prime Contract, the Sureties will undertake to complete Hunt's obligations . . ." – including, by implication, the obligation to pay Titan. *Id.*

The Court notes, as a threshold matter, that courts in the State of New Jersey have consistently held that "[a] performance bond issued to a contractor is primarily for the benefit of the person for whom the work is being performed" – in the case at bar, the Owner. *Hartford Fire Ins. Co. v. Riefolo Constr. Co.*, 81 N.J. 514, 525-26 (1980). Turning to the parties' contentions,

31

this Court finds the New Jersey Superior Court's decision in *M.G.M. Constr. Corp. v. N.J. Educ. Facilities Auth.* particularly persuasive. *See M.G.M.*, 220 N.J. Super. 483 (N.J. Super. Ct. Law Div. 1987). In that case, the New Jersey Educational Facilities Authority ("NJEFA") and M.G.M. entered into a contract to perform construction work for Trenton State College. *Id.* at 484. NJEFA also entered into similar agreements with Sussna and Bilman, which, along with M.G.M., were deemed "co-prime contractors." *Id.* at 485. All co-prime contractors were required to provide NJEFA with surety bonds with payment and performance obligations. *Id.* Bilman provided a single instrument payment and performance bond from a security ("the Bilman Security"), and later defaulted . M.G.M. subsequently alleged that it had suffered damages as a result of Bilman's default, and sought to recover for those damages against the Bilman Security.

In denying M.G.M. the right to seek damages under the performance bond, the court held that:

> [a]lthough the instant case involves a single bond instrument, both payment and performance obligations are included. Bilman and NJEFA specifically created third-party rights, under the payment portion, in those persons who furnished labor and materials under Bilman's prime contract. The only named beneficiary under the performance bond was NJEFA . . . . [T]he facts and circumstances indicate that this omission was intentional. Bilman and NJEFA knew how to create third-party rights in a bond, yet chose not to make MGM a beneficiary . . . .

*Id.* at 496.

Similarly, here, the performance bond does not extend third-party rights to Titan. Nothing in the record leads this Court to doubt that such an omission was anything but

32

intentional.  While Titan would have this Court read the Performance Bond broadly, this Court finds that the explicit inclusion of subcontractors as potential beneficiaries of the Payment Bond suggests that they would have been expressly named as potential beneficiaries of the Performance Bond had the parties intended to confer that status upon them.

The language of the Prime Contract confirms this interpretation by explicitly listing subcontractors as potential beneficiaries under the Payment Bond but not under the Performance Bond.  Titan's proposed reading of the Prime Contract – according to which payment of Titan should be deemed part of Hunt's performance under the contract  – defies common sense and is hereby rejected by this Court.

Accordingly, the Court concludes that there is no genuine issue of material fact that Titan is not entitled to set forth a claim against the Sureties under the Performance Bond.  The Court will therefore grant the Sureties' motion for summary judgment on the issue.

**III.    CONCLUSION**

For the foregoing reasons, the Court will grant in part and deny in part Defendants'

motion for partial summary judgment, will grant in part and deny in part Hunt's motion for

partial summary judgment, and will grant the Sureties' motion for partial summary judgment.

The Court hereby dismisses with prejudice Counts V, VII, VIII, X and XI of Plaintiff's Second

Amended Complaint.  An appropriate form of Order accompanies this Opinion.

Dated : March 19, 2007


                                            s/ Garrett E. Brown, Jr.
                                          GARRETT E. BROWN, JR., U.S.D.J.


34