NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                          :
TITAN STONE, TILE & MASONRY, INC.,
                                          :
         Plaintiff,                                    Civ. No. 05-3362  (GEB)
              v.                          :
                                                       **FINDINGS OF FACT AND**
HUNT CONSTRUCTION GROUP, INC.,            :           **CONCLUSIONS OF LAW**

         Defendant.                       :
_____
HUNT CONSTRUCTION GROUP, INC.,            :

         Third-Party Plaintiff,           :
              v.
                                          :
INTERNATIONAL FIDELITY INSURANCE
COMPANY,                                  :

         Third-Party Defendant.           :
_____

### BROWN, Chief Judge

### TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.     Whether Titan Unduly Delayed the Work. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

         1.    Titan's Arguments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

             a.    Project Delays Unrelated to Titan. . . . . . . . . . . . . . . . . . . . . . . 8

             b.    Delays in the Drawing Approval Process Attributable to Hunt. . . . 8

   c.  Delays to Fabrication of Facade . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

   d.  Delays to Titan's Erection and Alignment Work . . . . . . . . . . . . . 12

  2. Hunt's Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

   a.  Titan Made and Broke Promises About Erection and Duration . . 13

   b.  Titan Caused Delay by Failing to Fabricate Panels and Failing to Make Meaningful Progress on Handset Work . . . . . . . . . . . . . . . 15

   c.  Titan's Excuses Are Meritless . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

     i.  Panel Fabrication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

     ii.  Confusion as to Bulletins . . . . . . . . . . . . . . . . . . . . . . . . . 17

     iii.  Concrete Chipping . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     iv.  Weather Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     v.  Alleged Hunt Payment Failures . . . . . . . . . . . . . . . . . . . . 19

  3. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

   a.  Alleged Delay in Obtaining Approval . . . . . . . . . . . . . . . . . . . . 21

   b.  The Bulletins . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

   c.  Field Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

   d.  Prior Delays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

   e.  Concrete Chipping . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

B. Whether Hunt Wrongfully Terminated Titan . . . . . . . . . . . . . . . . . . . . . . . . . . 25

  1. Titan's Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

  2. Hunt's Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    3.     Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

C.    Whether Hunt Breached the Implied Covenant of Good Faith and Fair Dealing. 30

    1.     Titan's Arguments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    2.     Hunt's Arguments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    3.     Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

D.    Whether Hunt Anticipatorily Repudiated the Agreement. . . . . . . . . . . . . . . . . 33

E.    Whether Hunt's Actions Amounted to Fraud. . . . . . . . . . . . . . . . . . . . . . . . . . 34

F.    Whether Hunt Failed to Pay Titan in Connection With Certain Payment Applications

    and RCOs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

G.    Whether Hunt May Claim Against IFIC Under the Performance Bond. . . . . . . . 37

    1.     Hunt's Arguments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    2.     IFIC's Arguments.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    3.     Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

H.    Whether Hunt's Backcharges are Proper . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

    1.     Titan's Arguments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

    2.     Hunt's Arguments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

          a.     Delay Backcharges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

          b.     Completion and Correction Backcharges. . . . . . . . . . . . . . . . . 46

          c.     Structural Steel Remediation Backcharges. . . . . . . . . . . . . . . . 46

          d.     Lack of Persuasive Expert Testimony to Rebut Hunt's Backcharges

              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

   e.  Individual Backcharges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

  3.  Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    a.  Temporary Enclosure, Temporary Heat and Additional Labor Costs

       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

    b.  Roof Sequence and Handset Completion Backcharges. . . . . . . . . 50

    c.  Structural Steel Remediation Backcharges. . . . . . . . . . . . . . . . 50

    d.  Individual Backcharges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

I.  Damages.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

J.  Titan's Claims of Conversion and Violation of the New Jersey Trust Fund Act. 54

K.  Attorneys' Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

This matter comes before the Court upon the Second Amended Complaint of Plaintiff Titan Stone, Tile & Masonry, Inc.'s ("Titan" or "Plaintiff") against Defendant Hunt Construction Group., Inc. ("Hunt" or "Defendant"), and Hunt's Third Party Complaint against International Fidelity Insurance Company ("IFIC"). Titan seeks compensatory and punitive damages under the agreement signed by the parties for work performed in the construction of a library building on behalf of The College of New Jersey. The Court conducted a non-jury trial from June 5, 2007 to July 18, 2007, and had the opportunity to observe the manner and demeanor of the witnesses and to assess their credibility. *See United States v. $33,500 in U.S. Currency*, No. 86-3348, 1988 U.S. Dist. LEXIS 19475, at *2 (D.N.J. Aug. 17, 1988). The opinion below constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

## I.    BACKGROUND

Titan is a family-owned business based in New Jersey. ( Sec. Am. Compl. ¶ 1.) Titan claims to specialize in the design, fabrication and installation of a proprietary prefabricated wall panel system used for exterior and interior walls in large commercial buildings (hereinafter, the "Wall System"). (*Id*.) Hunt is a construction firm that provides general contracting services. (Hunt Answer ¶ 3.) Hunt was engaged by The College of New Jersey (the "Owner" or "College") to provide certain services in connection with the construction of a library (the "Project"). (Sec. Am. Compl. ¶ 3; Answer ¶ 3.) Hunt invited Titan to bid on the manufacture and installation of its Wall System for the Project. (Sec. Am. Compl. ¶ 4; Answer ¶ 4.) Titan submitted the winning bid, and entered into a subcontracting agreement with Hunt that defined both parties'

obligations in connection with the Project (the "Agreement").  (Sec. Am. Compl. ¶ 5; Answer ¶ 5.)  IFIC, a surety based in Newark, New Jersey, issued a performance bond covering Titan's work on the Project.  (Titan Br. ¶ 2.)

Titan now claims that Hunt failed to fulfill its obligations under the Agreement.  (Sec. Am. Compl. ¶¶ 6-19.)  Specifically, Titan alleges that Hunt materially breached the Agreement by "failing to pay Titan for work duly performed by Titan in accordance with [the Agreement]," by "failing to permit Titan to exercise its rights thereunder," and by "wrongfully terminating the [Agreement] without just cause."  (Sec. Am. Compl. ¶¶ 90-92.)

Moreover, Titan sets forth claims of fraud, anticipatory breach of the Agreement and breach of the implied covenant of good faith and fair dealing against Hunt for allegedly inducing Titan to continue working on the Project "by falsely representing to Titan that prior payments withheld from Titan by Hunt would be restored and that Titan would be duly paid for its continuing work erecting the Titan Wall System . . . ."  (*Id.* at ¶¶ 96, 103, 110, 115.)  Titan adds that Hunt was paid $2,000,000 from the Owner for work performed by Titan, but that Hunt "intentionally converted the funds [to its] own use by fraudulently and wrongfully refusing to pay the monies to Titan."  (*Id.* at ¶¶ 123, 125.)  Finally, Titan alleges that "[r]etention of the monies paid by the Owner to Hunt for Titan's work constitutes a benefit to Hunt to which it is not entitled in law or in equity and a violation of the New Jersey Trust [F]und Act."  (*Id.* at ¶ 146.)

Both parties were given the opportunity to present evidence during a month-long bench trial before the undersigned.  The following individuals were among the principal witnesses to testify at trial:

6

- Nicholas Caporuscio (NC) -- former Titan Stone employee. Mr. Caporuscio left Titan in May 2006. (Final Pre-Trial Order at 3, 104.)
- Joseph L. Farina (Joe Sr.) -- founder of Titan Stone, president of Titan at all relevant times. (*Id.* at 3, 93.)
- Joseph M. Farina (Joe Jr.) -- former employee of Titan Stone, and son of Joseph L. Farina. Vice-president of Titan from 1992 until June 28, 2004. (*Id.* at 3, 90.)
- Jeffrey Farina (Jeff) -- employee of Titan Stone, and son of Joseph L. Farina. (*Id.* at 98.)
- Joseph Giorgio (JG) -- Titan Stone employee. (*Id.* at 87.)
- Andrew Kobayashi (AK) -- Hunt employee, project manager for Hunt. (*Id.* at 121.)
- Debbie Luciano (DL) -- Titan Stone controller. Ms. Luciano was on maternity leave from May 2004 to Dcember 2004. (*Id.* at 109.)
- Vincent Martone (VM) -- Titan Stone employee. (*Id.* at 106.)
- Brian Murray (BM) -- former employee of the Owner. (*Id.* at 116)
- Jose Pienknagura (JP) -- Hunt's in-house general counsel. (*Id.* at 6.)
- Joseph Sullivan (JS) -- expert witness for Titan and employee of Metropolitan Engineering Associates, Inc. ("MEA"). (*Id.* at 89, 129.)
- Tim Vaughn (TV) -- former employee of Hunt. (*Id.* at 89, 127.)
- Larry Weisman (LW) -- Hunt employee, general contractor/construction manager for the Project. (*Id.* at 17, 117.)
- Frank Whelan (FW) -- IFIC claims manager assigned to the Project. (*Id.* at 111.)
- Nick Sabia (NS) -- owner of D.M. Sabia & Co ("Sabia"), hired to replace Phoenix. (*Id.* at 19, 110.)
- Dave Ericson (DE) -- Hunt employee. senior field superintendent for the Project. (*Id.* at 126.)
- Eddie Lesok (EL) -- Project Manager for Advanced Cast Stone ("ACS"). (*Id.* at 116.)
- Dave Ericson (DE) -- Hunt's senior field superintendent for the Project. (*Id.* at 126.)
- Charles Boland (CB) -- expert witness for Hunt and employee of Grey Hawk North America ("Grey Hawk"). (*Id.* at 129.)
- Allyn Kilsheimer (KCE) -- expert witness for Hunt and employee of KCE Structural Engineers, P.C. (*Id.* at 131.)

## II.   DISCUSSION

### A.   Whether Titan Unduly Delayed the Work

Titan contends that the Project suffered delays because of field conditions and an unduly

lengthy drawing approval process, both of which it blames on Hunt. Titan Br. at 1. Titan

7

maintains that it continued its work on the Project in spite of these delays, and completed its assigned tasks.  Hunt, however, insists that Titan simply failed to comply with the construction schedule and now seeks to assign the blame for that failure on other parties to the Project.

      1.    Titan's Arguments

      a.    Project Delays Unrelated to Titan

Titan claims that the evidence produced at trial proves that a number of the delays incurred on the Project were not attributable to them.  First, Titan claims to have established through the testimony of Mr. Kobayashi and Mr. Murray that significant delays were incurred when Project workers found an underground duct bank and steam piping wrapped in asbestos on the construction site.  Titan Br. ¶¶ 35-36.  Titan also notes Mr. Kobayashi's acknowledgement that the construction work was further delayed by the lengthier-than-expected process of obtaining permits from the Department of Community Affairs.  *Id.* at ¶ 37.

Second, Titan submits to the Court that both Mr. Kobayashi and Mr. Murray admitted that weather conditions on the site caused significant delays for the Project in general.  Titan contends in particular that the weather prevented the pouring of concrete, a condition precedent to the completion of its own work on the Project.  *Id.* at ¶¶ 38-39.

      b.    Delays in the Drawing Approval Process Attributable to Hunt

In addition to the sources of delay outlined above, Titan claims to have established at trial that Hunt caused major delays in Titan's work by failing to provide timely approval of Titan's drawings.  Mr. Martone testified at trial that "there [we]re 3 types of drawings required to fabricate and erect the Titan panels -- preweld drawings, shop drawings and truss/panel

8

fabrication drawings." *Id.* at ¶ 47, *citing* Tr. V. 3 (VM) 14:18-15:2.   Mr. Martone represented to the Court that the truss/panel fabrication drawing process could not begin until the shop drawings had been approved, and that these, in turn, could not be initiated until approval of the preweld drawings had been received.   Titan Br. at ¶ 48, *citing* Tr. V. 3 (VM) 15:18-21, 16:16-20.   Titan's drawings for the Project were all prepared by Curtain Wall Design & Consulting, Inc. ("CDC"), Titan's outside engineer for the Project and a company with whom Titan had worked for over 16 years.   Titan Br. at ¶ 50, *citing* Tr. V. 2 (Joe Jr.) 17:12-18.

Titan alleges that the drawing approval process usually takes 10 working days.   Titan Br. at ¶ 51.   Titan claims to have shown through Mr. Martone's testimony that Hunt compelled Titan to start work on the pre-weld drawings on October 13, 2003, even though contract drawings of the project architect (the "Architect" or "Kitchen") and the project engineer for Hunt, STV ("STV" or the "Engineer"), were only 75% complete.   *Id.* at ¶ 52.   Titan also suggests that Hunt, Titan, the Architect, the Engineer and the Owner had a meeting in September 2003 during the course of which it was agreed that the brick and cast stone facade of the panels on the North and South elevation would be installed on the Project site, rather than at Titan's facility.   *Id.* at ¶ 53.   Titan contends that this decision compelled it to add preweld connections, and that, as a result, it was only able to submit its drawings and calculations for the additional preweld connections on November 20, 2003.   *Id.*   According to Titan, Hunt thus caused delays in Titan's work by forcing it to plan its Wall System on the basis of incomplete information that was materially modified at a late stage in the planning.

Titan also claims that the Project work was delayed when Titan's pre-weld drawings were

rejected by the Engineer on the grounds that it required hand calculations in addition to CDC's computer calculations. *Id.* at ¶ 54. Mr. Martone testified that never before in Titan's decades in the industry had it been required "to provide hand or manual preweld calculations instead of industry standard computerized calculations." *Id.*, *citing* Tr. V. 3 (VM) 32:20-33:17. Titan contends that it tried to accomodate Hunt's requests, but that Hunt nonethetheless failed to provide approval of the pre-weld drawings. Titan Br. at ¶¶ 55-57. In particular, Titan points to a number of emails between Joe Farina, Jr., Mr. Kobayashi and Ms. Neeff (another Hunt employee) allegedly proving (i) that Titan did its utmost to ensure prompt approval of the drawings and (ii) that Hunt knew it was under an obligation to promptly provide approval of the drawings. *Id.* at ¶ 57.

Titan submits to the Court that, while it was its normal practice to wait for the approval of preweld drawings before preparing its shop drawings, the delay in getting approval of the preweld drawings forced it to begin preparing its shop drawings earlier than expected. *Id.* at ¶ 59. Titan claims that it submitted those shop drawings to Hunt on January 29, 2004, yet never received approval for them. *Id.* at ¶¶ 59-60. Titan adds that Hunt provided Titan with the changes to Bulletin No. 5 on February 5, 2004, which led Titan to modify its shop drawings. *Id.* at ¶ 60, *citing* Tr. V. 3 (VM) 60:8-13, 63:4-11. The original shop drawings were eventually returned to Titan with the inscription: "Conformed as Noted". Titan Br. at ¶ 61. According to Mr. Martone, this did not amount to approval of the drawings. *Id.*, *citing* Tr. V. 3 (VM) 50:22-51:4.

Titan further claims to have established that Hunt gave confusing instructions as to the

scope of the work to be performed by Titan, and that the resulting confusion led to further delays

in the Project.   Indeed, Titan argues that it submitted the shop drawings reflecting the changes of

Bulletin No. 5 on May 17, 2004.  *Id.* at ¶ 65.  On July 21, 2004, the drawings were returned to

Titan with mark-ups.  *Id.*  By that time, Bulletins 6 and 7 had been issued, both of which,

according to Mr. Martone, "impacted Titan's shop drawings and its work."  *Id.*, *citing* Tr. V. 3

(VM) 66:15-67:14, 69:1-13.   Titan alleges that Mr. Martone's testimony at trial establishes that

Titan was subsequently given contradictory instructions as to whether it should proceed with the

fabrication of the panels on the basis of the original drawings or any of the subsequent versions.

Titan Br. at ¶ 66.  The confusion was only resolved, according to Titan, after the August 31, 2004

meeting between Titan, CDC, and the Project Engineer and Architect.  *Id.* at ¶ 67.

> c.      Delays to Fabrication of Facade

Titan also suggests that it should not bear any responsibility for the delays in the

fabrication of the wall panels, as both Hunt and ACS prevented it from fabricating the panels on

schedule.  Indeed, Mr. Martone explained that the Wall System panels involve a steel frame with

a galvanized steeel panel, and that the exterior of the panel was laminated with the brick and cast

stone facade.  *Id.* at ¶ 69.  Mr. Caporuscio confirmed that Titan began fabrication before the

drawings were approved, but could not complete fabrication until receipt of the finalized

drawings on August 31, 2004.  *Id.* at ¶ 71.  Titan concludes that Hunt bears at least part of the

responsibility for the delays in panel fabrication.

Titan also insists that the company it hired to to create the cast stone for the Project,

ACS, shares the blame for the fabrication delays, *id.* at ¶¶ 73-74, as Mr. Caporuscio testified that

ACS delivered misfabricated cast stone and failed to deliver some of the pieces of cast stone on time. *Id.* at ¶ 74, *citing* Tr. V. 4 (NC) 210:12-19, 211:3-5.  According to Titan, the testimony offered at trial confirms that it fabricated the panels as quickly as possible under the circumstances, and in fact ended up producing them only three weeks after the projected deadline. *Id.* at ¶ 76.

> d.   Delays to Titan's Erection and Alignment Work

As a threshold matter, Titan submits that it never committed, during the August 31, 2004 meeting between the parties, to start erecting the panels on October 4, 2004.  Titan claims that Hunt's suggestions to the contrary are simply incorrect.  Jeff Farina insisted on the stand that Titan had in fact promised only to try its best to meet that deadline. *Id.* at ¶ 84, *citing* Tr. V. 7 (Jeff) 87:15-93:20.  Next, Titan argues that Hunt's October 2004 deadline was unreasonable under Section 9.4 of the Agreement (which requires that Hunt's decision with respect to scheduling of Titan's work be reasonable) particularly since:

(i) Hunt was well aware that Titan had only started fabrication of the brick and cast stone panels a few weeks before,

(ii) the preweld connections had still not been repaired at the time,

(iii) there were access issues because of mud on the site, and

(iv) no concrete chipping had been performed.

Titan Br. at ¶¶ 85-86.

Titan further suggests that Interstate Iron Works ("IIW") must share at least part of the responsibility for delays to Titan's erection work.  Indeed, Titan suggests that the preweld

connections had to be corrected before Titan could install its panels.  *Id.* at ¶ 78.  The connections were only corrected by IIW beginning on September 27, 2004.  *Id.* at ¶ 79.

Finally, Titan insists that Hunt's own failure to remedy the elevated concrete situation is to blame for much of the delay incurred on the site.  Hunt was informed in turn on August 24, 2004 that the preweld connections were too high as a result of an improperly elevated concrete deck.  Titan Br. at ¶ 87.  Titan submits that under Section 13 of the Agreement, "Titan was to advise Hunt of the high concrete elevations so that Hunt could correct the condition in a reasonable period of time."  *Id.* at ¶ 88, *citing* Hunt Ex. 125, at § 13.  Titan claims to have established through Mr. Giorgio's testimony that upon learning of the problem, "Hunt had to have Quinn [Hunt's concrete specialist] chip away the concrete under the . . . panels so that all the panels could be brought to the proper elevation."  Titan Br. at ¶ 91, *citing* Tr. V. 4 (JG) 24:5-10.

According to Titan, the evidence produced at trial shows that Hunt only assigned a limited number of men -- and only one concrete saw -- to chip away the concrete.  *Id.* at ¶¶ 92-98.  The chipping allegedly started on November 23, 2004.  *Id.* at ¶ 92.  Titan claims that while Hunt represented to Titan in writing that the chipping would be accomplished by January 6, 2005, the process in fact continued until the end of February, directly causing Titan's erection delays.  *Id.* at ¶ 101.

    2.    Hunt's Arguments

        a.    Titan Made and Broke Promises About Erection and Duration

Hunt takes exception to Titan's characterization of the evidence presented at trial.  According to Hunt, "[t]he Project baseline schedule incorporated by reference in the October 13,

2003 [Agreement] -- and every schedule update thereafter [--] provided that Titan would erect and align its panels in 30 work days . . . or approximately six weeks." *Id.* at 1. Hunt further contends that both Mr. Joe Farina, Jr. and Mr. Ericson acknowledged that "Titan never objected to the baseline schedule, the 30 day erection and alignment duration, or the dates for that work." *Id.*, *citing* Tr. V. 2 (Joe Jr.) 80:15-81:5, 81:19-21); Tr. V. 15 (DE) 41:15-22.

Hunt notes that it quickly became clear, however, that Titan would not be able to comply with Hunt's preferred erection start-date of mid-September. Hunt Br. at 1. Hunt submits that it chose to compromise with Titan instead of holding Titan to that date, eventually settling on an erection date of October 4, 2004. *Id.* at 1-2, *citing* Tr. V. 16 (AK) 192:18-194:8. Hunt contends that Titan nonetheless only started erecting arcade panels on October 18, 2004, and did not start erecting exterior panels until November 22, 2004. *Id.* at 3. To compound the injury caused by these delays, approximately 25-35% of the panels were delivered without brick or cast stone facades. *Id.* Hunt submits to the Court that Titan's failure to fabricate and deliver the panels fast enough meant that Titan "did not finish erecting and aligning panels until March 15, 2005, 16 weeks after it started erecting exterior panels and nearly 21 weeks after it started erecting arcade panels." *Id.*, *citing* Tr. V. 20 (LW) 44:24-45:9.

Mr. Boland concluded at trial that Titan caused a 6-month delay in the project completion date, which was mitigated by Hunt's efforts to temporarily enclose and heat the building and accelerate follow-on subcontractors on overtime. Hunt Br. at 4. Hunt claims that these mitigation efforts cost $1,591,562.22, and that it proved at trial that it properly exercised its right under Section 32 of the Agreement to apportion the delay damages to Titan. *Id.* at 5.

14

b.      Titan Caused Delay by Failing to Fabricate Panels and
        Failing to Make Meaningful Progress on Handset Work

Hunt insists that the testimony of Mr. Murray and Mr. Kobayashi establishes that "Titan was unable to finish its work as scheduled because it did not fabricate enough panels."  *Id.* at 5, *citing* Tr. V. 1 (BM) 154:19-156:9; Tr. V. 16 (AK) 196:25-199:8.  Hunt maintains that Jeff Farina, the vice-president of Titan, admitted as much when he testified "that none of the issues Titan complain[ed] about prevented Titan from erecting its panels."  Hunt Br. at 5-6, *citing* Tr. V. 8 (Jeff) 165:20-170:4.  Indeed, Hunt suggests that Titan must shoulder the blame for failing to timely fabricate and erect the panels, as:

- Mr. Lesok testified that Titan decided to have CDC prepare cast stone tickets when ACS normally prepared its own stone tickets.  CDC misfabricated the cast stone.  Hunt Br. at 6, *citing* Tr. V. 7 (EL) 13:6-25, 34:12-37:20.

- Mr. Caporuscio, Mr. Jeff Farina and Mr. Ericson testified that ACS also failed to properly manufacture cast stone, a key component of the panels.  According to Hunt, "ACS claimed that CDC was responsible because Titan never gave ACS the proper stone tickets."  Hunt Br. at 6, *citing* Tr. V. 4 (NC) 229:22-25; Tr. V. 8 (Jeff) 132:16-133:15; Tr. V. 15 (DE) 46:11-25.

- Mr. Lesok testified that ACS decided to stop shipping product at the end of 2004 because of Titan's failure to pay for its services. Hunt Br. at 6, *citing* Tr. V. 7 (EL) 37:21-39:4.

15

- The evidence showed that 25-35% of the paneling was installed in the field without the brick and cast stone facade.  Hunt Br. at 6-7.

Hunt concludes that the testimony presented at trial proves that Titan is responsible for the delays in timely producing the wall panels, and that Titan made no progress on the handset work in the 18 months preceding its termination.  *Id.* at 7.

### c.  Titan's Excuses Are Meritless

Hunt notes that Titan has set forth a number of attempted justifications for the delays. Hunt urges the Court to disregard such excuses, arguing that they have been demonstrated at trial to be meritless.  *Id.* at 16.

### i.  *Panel Fabrication*

Hunt strongly contests Titan's allegation that "it was unable to fabricate panels because of delays in the approval of its preweld calculations and shop drawings."  *Id.* at 17.  Indeed, Hunt maintains that the documents introduced at trial confirm that Titan was expected to *deliver* its panels by January 21, 2004, but was only required to *erect* them on June 11, 2004.  *Id.*, *citing* Hunt Ex. 19.  That evidence shows, according to Hunt, that Titan's shop drawings "could have been delayed by four-and-a-half months without delaying the as-planned June 11, 2004 start of erection."  Hunt Br. at 17.

Hunt adds that that Titan itself was responsible for months of shop drawing delays.  *Id.* at 17-18.  In fact, Hunt contends that the drawings initially submitted by Titan were not only incomplete, but also had been created using proprietary software, which prevented STV from verifying the calculations.  *Id.*  at 18.  Hunt insists that STV would have "risked its license by

allowing work to go forward without checking the loads imposed on the building structure by Titan's panels." *Id.*

Hunt also claims to have established through the testimony of Mr. Kilsheimer and Mr. Lesok that Titan "ordered some of its materials in a timely manner and could have been fabricating approximately 75% of its panels by March 2004." *Id.* at 18-19, *citing* Tr. V. 21 (KCE) 94:15-95:20; 82:6-84:16; Tr. V. 4 (NC) 202:9-25. According to Hunt, "[o]nce ACS had the fabrication tickets, there was no reason it could not fabricate the cast stone to achieve an October 2004 panel erection start." *Id.* at 19.

### ii. Confusion as to Bulletins

Next, Hunt insists that Titan's delay was not caused by any confusion regarding whether to proceed with Bulletins No. 5, 6 or 7. Instead, Hunt maintains that any such delay was attributable entirely to Titan. *Id.* Indeed, Hunt suggests that Titan drafted purchase orders in compliance with Bulletin No. 5, but inexplicably delayed sending those orders to ACS. *Id.* Moreover, Hunt claims that Titan never notified Hunt that it was confused about the orders it was to follow. *Id.* at 19. In fact, Hunt contends that "Titan told Hunt that it did not intend to proceed with engineering for Bulletin 6 changes unless Hunt approved Titan's pricing for that work" and even told Hunt on August 3, 2004 that "it was not proceeding with Bulletin 6 or 7 changes." *Id.* at 19. Hunt further claims that "Hunt directed Titan NOT to proceed with Bulletin 6 changes." *Id.* at 20 (emphasis in original).

### iii. Concrete Chipping

Hunt also denounces as baseless Titan's claim that its slow performance was attributable

17

in part to Hunt's failure to promptly chip the concrete.  *Id.*  Indeed, Hunt claims that the testimony of Mr. Giorgio and Jeff Farina showed that "concrete only prevented Titan from aligning its panels - not delivering and erecting them."  *Id.* (emphases omitted), *citing*  Tr. V. 4 (JG) 98:10-22; Tr. V. 8 (Jeff) 162:3-12.   Hunt adds that Titan's inability to erect panels on schedule arose from its failure to fabricate the panels fast enough, rather than the high concrete. Hunt Br. at 20.  Hunt also insists that Mr. Kobayashi testified that the concrete chipping only affected seven panels, and would not therefore excuse Titan's overall late performance.  *Id.*, *citing* Tr. V. 18 (AK) 151:5-153:3.

Titan's complaints relating to the chipped concrete are particularly misplaced, according to Hunt, because Titan failed to notify Hunt of its concerns relating to the concrete and thus failed to comply with the Agreement's written notice requirements.  *Id.* at 21.  Hunt argues that the Agreement compels Titan to give Hunt "written notice of any condition that needed to be corrected before Titan could perform its work."  *Id.*, *citing* Hunt Ex. 125 at §§ 9.5, 13.1 and 14.1. Hunt claims that Titan provided such written notice regarding necessary concrete chipping at two discrete locations on August 24, 2004, Hunt Br. at 21, and that Hunt ensured that these limited areas were chipped before Titan started work.  *Id.*  Moreover, Hunt claims that Mr. Kobayashi testified  that "Titan presented no other complaints about high concrete before Titan started erecting panels on November 22, 2004."  *Id.*, *citing* Tr. V. 16 (AK) 244:19-245:13.  This is particularly noteworthy, according to Titan, because "Titan *did* document missing and misplaced preweld connections . . . in a written survey," which resulted in Hunt correcting all the preweld connections before Titan started erecting the panels.  *Id.* at 21 (emphasis in original).  Hunt

submits that if Titan had actually been concerned about concrete chipping at the time of the events at issue, they would have immediately brought those concerns to Hunt's attention.

Finally, Hunt notes Mr. Kilsheimer's testimony that "Titan's out of sequence erection of panels caused Titan to have to fan-in the first floor panels" -- scraping the concrete in the process -- and that "Titan's panels were fabricated larger than the building vertical dimension which also would contribute to the need to chip concrete." *Id.* at 22. For all the foregoing reasons, Hunt contends that the concrete chipping process does not excuse Titan's delay in performance.

<em>iv.     Weather conditions</em>

Hunt similarly rejects Titan's argument that the site conditions and weather prevented it from completing its work. *Id.* at 22. Indeed, Hunt contends that the evidence introduced at trial showed that Titan would have finished its work before the beginning of December had Titan started erecting panels on October 4, 2004 -- as it had agreed to. *Id.* Hunt submits, moreover, that Mr. Weisman's testimony proved that Titan itself "was responsible for many of the problems it had with site conditions," as it caused the delays which forced them to work on the site deep into the Fall and Winter of 2004. *Id.* at 23, *citing* Tr. V. 20 (LW) 71:1-4.

<em>v.     Alleged Hunt Payment Failures</em>

Hunt suggests that the evidence introduced at trial completely rebuts Titan's argument that payment failures on Hunt's part were to blame for Titan's late performance. Hunt Br. at 23. According to Hunt, the Agreement "specifically required Titan to provide payment and performance bonds before Hunt was obligated to pay Titan." *Id.*

Hunt notes that it paid Titan on June 23, 2004, two days after it provided the bonds. *Id.*

19

In fact, Hunt claims to have shown through the testimony of Jeff Farina that "Hunt was never late in making a progress payment to Titan . . . until January 19, 2005." *Id.* at 24.   Indeed, Hunt contends that Titan only considered Hunt to have paid late with respect to the pay application submitted by Titan on November 18, 2004.  *Id.*

In addition, Hunt insists that Section 4.2 of the Agreement "does not require Hunt to pay Titan until the Owner has paid the corresponding amount to Hunt," and that "Hunt had not received that payment as of January 31."  *Id.*  Hunt further claims (i) that it "learned [in January 2005] that Titan had not timely paid some of its vendors and those vendors were demanding that Hunt issue joint checks," and (ii) that it was concerned it may become liable under Section 5.3 of the Agrement for unpaid amounts to Titan's suppliers.  Hunt Br. at 24*, citing* Tr. V. 17 (AK) 49:23-51:11.  Hunt argues that under the circumstances, it "was within its [Agreement] rights to withhold payment from Titan."  *Id.*[1]

Finally, Hunt counters Titan's allegations by arguing that "Titan accepted money from Hunt, to be held in trust for ACS, but never actually paid the money to ACS."  *Id.* at 29.   Hunt contends that under Section 5.10 of the Agreement, that money constituted "trust funds in the hands of [Titan] to be applied, before application to any other purpose, to the payment of the . . . suppliers [and] materialmen . . . ."  *Id.*, *quoting* Hunt Ex. 125, at § 5.10.

       3.       Analysis

Having reviewed all the parties' submissions, and having weighed and considered the testimony offered at trial, the Court finds that Titan bears responsibility for the delays incurred on

---

[1]      Hunt notes that it nonetheless paid Titan for that payment application with a check on February 1 and another one on February 9.  *Id.* at 25.

the Project.  Each ground of delay will be addressed in turn.

a.      Alleged Delay in Obtaining Drawing Approval.

Titan maintains that one of the principal causes of the delay it experienced in completing its work on the Project was Hunt's alleged failure to promptly approve the project drawings.  The Court, however, finds more credible the evidence tending to show that Titan itself was responsible for those delays.

The Court notes that Mr. Martone and Mr. Joe Farina, Jr. testified that the normal turnaround time for approval by a general contractor of Titan's drawings was about two weeks. Tr. V. 3 (VM) 18:20-23; Tr. V. 2 (Joe Jr.) 21:11-21.  It appears that Hunt did not object to such a timeframe.  Tr. V. 2 (Joe Jr.) 21:22-24.  Mr. Kilsheimer, however, testified that STV and Kitchen found CDC's pre-weld drawings to be incomplete, and lacking in detail.  Tr. V. 21 (AK) 65:7-15. Even more to the point, Mr. Kilsheimer noted that the CDC drawings submitted by Titan had been obtained using two computer programs, one of which was a CDC in-house program.  *Id.* at 65:17-24.   Mr. Kilsheimer insisted that it was impossible for STV, Kitchen or Hunt to confirm the validity of the drawings and numbers provided (i) because they did not know the data that had been plugged in to the programs, and (ii) because Hunt and its engineers did not have access to CDC's in-house program.  *Id.* at 65:24-66:7.  Accordingly, Mr. Kilsheimer found STV's request for manual calculations to be appropriate.  *Id.* at 66:8-15.

This request also strikes the Court as eminently reasonable, particularly in light of Hunt's representation that "STV risked its license by allowing work to go forward without checking the loads imposed on the building structure by Titan's panels."  Hunt Br. at 18.   Mr. Martone

21

confirmed that STV's November 2003 request for input data and hand calculations remained outstanding and unmet as of February of 2004.  Tr. Vol. 3 (VM) 110:22-111:7.   The Court therefore finds that Titan unnecessarily delayed the Project by failing to provide hand calculations for the pre-weld drawings.  It cannot blame Hunt for delays in connection with the drawing approval process.

b.    The Bulletins

The Court also rejects Titan's argument that Hunt was responsible for a significant part of the delays since Titan was left in the dark as to whether it should perform its work in conformity with Bulletins No. 5, 6 or 7.

Mr. Martone testified that the revised shop drawings were given to Hunt for approval in May 2004, and confirmed that those drawings were not returned until July 2004.  Tr. V. 3 (VM) 63:19-65:14  Tr. V. 3 (VM) 64:3-6.  Mr. Martone also testified that Titan received change bulletins 6 and 7 in July 2004, at which point it had not received proper approval of its revised shop drawings.  *Id.* at 66:15-67:16.

The Court is not convinced, however, that Titan was reasonably delayed in its work at this juncture because it found itself "in a quandary."  While Mr. Martone testified that Hunt's initial instructions to Titan with respect to Bulletins 6 and 7 were to proceed with construction in compliance with those bulletins, Tr. V. 3 (VM) 67:17-20, that testimony appears contradictory to the documentary evidence and the credible testimony of Mr. Sullivan.  Indeed, Mr. Sullivan testified that Titan informed Hunt that it would not proceed with modifications under Bulletin 6 until it received specific instructions to do so, and would in fact continue operations under

22

Bulletin No. 5.  Tr. V. 13 (JS) 93:2-5, 96:6-24.  Moreover, the Court finds credible the testimony

of Mr. Lesok that ACS was never instructed by Titan to stop working on the basis of Bulletin No.

5,  Tr. V. 7 (EL) 78:13-21, and the testimony of Mr. Sullivan confirming that a competent

subcontractor would have interpreted Bulletin 5 to define Titan's scope of work.  Tr. V. 21

(KCE) 190:25-191:12.  Accordingly,  the Court finds that the issuance of Bulletins No. 6 and 7

did not excuse the delay in Titan's performance.

c.      Field Issues

The Court is also not convinced that on-site field issues can legitimately be blamed for

delays in Titan's work.  The Court notes that Mr. Giorgio described the site as a "pig sty" leading

to great difficulties in moving the crane used to remove the panels from the delivery trucks to the

site. Tr. V. 4 (JG) 20:18-22.  This was consistent with the testimony of Jeff Farina and Joe

Farina, Sr.  Tr. V. 7 (Jeff ) 120:17-123:23; Tr. V. 8 (Joe Sr.) 264:8-265:12.  The Court believes,

however, that the testimony produced at trial confirms that the muddy site and cold weather

conditions were due entirely to the late start on the erection process.  Indeed, Mr. Weisman

testified that had Titan "started October 4th[, as it had agreed to do,] and been done, we wouldn't

be trying to erect panels in January after freeze and thaws and rain.  The fall -- the summer and

the fall were dry."  Tr. V. 20 (LW) 71:2-4.  The Court found above that the delay in the erection

of the panels was attributable to Titan.  Titan cannot now argue that Hunt is to blame for the

delaying circumstances proximately caused by its own failure to adhere to schedule.

d.      Prior Delays

The Court is not persuaded either that project delays unrelated to Titan are to blame for

23

the delay in performance in the case at bar.  There is no denying that the Project as a whole was delayed by a month as a result of the discovery of an asbestos-covered steam piping.  *See* Tr. V. 17 (AK) 109:17-110:20.  It also appears undisputed that project delays were incurred because of difficultes in obtaining permits from the Department of Community Affairs.  *Id*. at 111:21-112:10; Tr. V. 1 (BM) 36:5-20.

These are not, however, the delays at issue in this case and the delays behind Titan's termination.  The evidence offered at trial establishes conclusively that Hunt and Titan jointly decided on a starting erection date of October 4, 2004.  Tr. V. 16 (AK) 189:11-190:10, 192:18-194:8, Hunt Ex. 215.  That decision was reached on August 31, 2004, well after the asbestos- and permit-related delays became apparent.  Those earlier delays are not relevant to Titan's alleged failure to erect and install its Wall System in the Fall and Winter of 2004, and cannot be blamed by Titan for its failure to adhere to the agreed-upon schedule.

### e.     Concrete Chipping

Finally, the Court is not convinced that Titan's inability to complete the installation of the Wall System on schedule can be blamed on Hunt's alleged failure to promptly complete the concrete chipping process.   The Court notes as a threshold matter that Titan was aware that concrete chipping would be necessary before agreeing to the October 4 start date for the erection process.  Tr. V. 4 (JG)  17:19-25.   In spite of the evidence that the concrete chipping was only completed at the end of February, and Mr. Giorgio's claim that Hunt only devoted a minimal amount of resources to completing the job promptly, Tr. V. 4 (JG) 30:1-10, the Court finds that the high concrete condition does not excuse Titan's delays.  Indeed, convincing evidence was

24

introduced at trial that the concrete chipping only affected seven of the panels that needed to be installed on the Project Site,  Tr. V. 18 (AK) 151:5-153:3, and that while the concrete may have prevented alignment of the panels, it did not prevent their delivery and erection.  Tr. V. 4 (JG) 98:10-22; Tr. V. 8 (Jeff) 162:3-164:18.  Even if the concrete chipping took longer than originally promised, it seems clear to the Court that the delay in installing the Wall System is in fact attributable to Titan's own failure to comply with the agreed-upon installation schedule and its inability to fabricate the panels fast enough.  Tr. V. 15 (DE) 41:1-20.

### B.    Whether Hunt Wrongfully Terminated Titan

#### 1.    Titan's Arguments

Titan claims that the evidence introduced at trial suggests that Hunt wrongfully terminated Titan.  Indeed, Titan claims to have established that it began fabricating its brick and cast stone panels in the week of September 9, 2004, and that it completed the erection of its panels on February 17, 2005.  Titan Br. ¶¶ 108-09.  Titan adds that Mr. Kobayashi and Mr. Georgio confirmed that the panel alignment was completed on March 9, 2005.  *Id*. at ¶ 110.  Titan concludes that the fabrication, erection and alignment of panels was shown at trial to have taken approximately 6 months -- the duration originally contemplated in the September 4, 2003 schedule.  *Id*. at ¶ 111.

Titan insists that it never interrupted its fabrication process, and maintains that the testimony of Jeff Farina and Mr. Giorgio proved that the erection and alignment of panels was only paused by the Ironworkers until Hunt released joint checks to the Ironworkers Benefit Funds.  *Id.* at ¶ 113.  Titan claims that it acted diligently in completing its work on the Project,

and notes that while Phoenix was initially expected to begin the handset work after erection and alignment of Titan's panels, Phoenix actually began the handset work prior to that. *Id.* at ¶¶ 114, 116. In sum, Titan suggests that it adhered closely to the Agreement and performed its duties in a conscientious and efficient manner.

Titan suggests that it was shocked to learn on January 17, 2005 that Hunt had placed all pending payments to Titan on hold. *Id.* at ¶ 117. It was also informed on that day that Hunt had issued a 72-hour notice to Titan regarding the alignment of the panels on the south side of the Project. *Id.* at ¶ 118. Titan claims that Hunt sent two letters to Titan on January 31, 2005. *Id.* at ¶ 120. One notified Joe Farina, Sr. "that Titan was in default because the Ironworkers 'sat down' []as a result of Hunt not issuing the joint check authorized by Titan . . . ." *Id.* The other was a letter from Mr. Kobayashi providing 72 hours' notice to Titan regarding the alignment of the east elevation panels. *Id.* Titan claims to have proven at trial that the issues raised in both of those letters were immediately resolved, as "[t]he Ironworkers recommenced work on the next day," and the "72-hour notice letter was obviously in error because the alignment of the east elevation had been completed prior to the issuance of the . . . 72-hour notice letter." *Id.* at ¶ 121. Titan concludes that Hunt did not therefore have any grounds to terminate Titan.

Titan goes on to claim that Hunt deliberately induced Titan to perform work at the site, all the while expecting to terminate Titan at Hunt's earliest convenience. Indeed, Titan submits to the Court that Mr. Weisman promised to Titan on February 3, 2005 that Hunt would pay an additional $330,000 against Titan's December 2004 pay application. *Id.* at ¶ 122. This promise was memorialized in a February 3, 2005 letter to Titan. *Id.* Mr. Kobayashi testified that the

26

letter mandated that Titan deliver the remaining panels upon receipt of the letter.  *Id.*  Titan

insists in fact that Hunt promised at a February 7, 2005 meeting that the payment of $300,000 to

Titan was imminent.  *Id.* at ¶ 125.

Titan suggest that these promises were deceptive, as Hunt was allegedly planning on

terminating Titan.  Indeed, Titan submits that Mr. Weisman contacted Sabia on February 4, 2005

to discuss hiring Sabia to replace Phoenix for the handset work.  *Id.* at ¶ 123.

The evidence at trial showed that Titan received a check for $43,572.55 in February 2005

representing the balance of Titan's November 2004 payment application.  *Id.* at ¶ 128.  Titan

contends, however, that "[n]o monies were ever paid to Titan for the handset work performed by

Phoenix."  *Id.*  As a result, Titan did not pay Phoenix, and Phoenix slowed down its work.  *Id.*

Titan rejects the testimony of Hunt's witnesses that payment was withheld because it was

"conditioned upon the delivery of panels and that the panels were not delivered."  *Id.* at ¶ 130.

Indeed, Titan suggests that all the panels were delivered to the site by February 10, 2005, only

five work days after Hunt's February 3, 2005 promise to pay Titan.  *Id.*

Hunt attempted to notify Titan on March 28, 2005 through a letter to Mr. Murray that it

was in the process of terminating Titan.  *Id.* at ¶ 138.  Jeff Farina testified, however, that he never

received a copy of Hunt's letter, and that no one from Hunt advised Titan that the letter had been

sent.  *Id.* at ¶ 144.  On March 24, 2005, Hunt issued its Notice of Termination to Titan.  *Id.* at ¶

143.  Titan concludes that the evidence outlined above proves that it did not violate Section 30 of

the Agreement, and that it was therefore improperly terminated by Hunt.  *Id.* at ¶ 147.

2.      Hunt's Arguments

Hunt takes exception with Titan's position, and claims that it properly terminated Titan

under Section 30 of the Agreement because Titan:

> (1) exhibited a pattern and practice of failing to uphold its promises
> regarding future performance;
>
> (2) stopped making any meaningful progress in the handset brick
> and cast stone work; and
>
> (3) diverted a shipment of cast stone destined for the Project site to
> Titan's facility.

Hunt Br. at 8.[2]

Hunt insists that Titan's failure to make meaningful progress on the handset work justified

its termination.  *Id.*  Indeed, Hunt argues that the testimony of Mr. Vaughn, Mr. Weisman and

Mr. Ericson proves that "the Owner pressured Hunt to make a decision" in the weeks leading up

to the termination, because Phoenix would have needed until February 2006 to finish the handset

work at the pace it was working before termination.  *Id.* at 9.  Hunt adds that "[u]nder Section 30

of the [Agreement], if Titan does not perform a portion of its scope of work, Hunt can give Titan

a 72-hour written notice to do so."  *Id.*  Hunt submits to the Court that it issued five such notices

to Titan between January 17, 2005 and February 9, 2005.  *Id.* at 8.

Most importantly, however, Hunt argues that Titan "compounded its lack of progress on

the handset work by hijacking cast stone . . . ."  *Id.* at 9.  Hunt claims that in March 2005 ACS

was shipping the stone directly to the Project site, but that a shipment scheduled for delivery on

---

[2]     Hunt insists that Titan's alleged pattern of failing to uphold promises alone was
not a basis for termination, but provided context for Hunt's eventual decision to
terminate Titan.  *Id.*

March 10 failed to arrive.  *Id.*  Jeff Farina allegedly testified that he had the shipment diverted to Titan's facility, leading Mr. Kobayashi to find Titan in material breach of the Agreement.  *Id.* According to Mr. Vaughn and Mr. Kobayashi, Hunt was left with no choice but to terminate Titan when it repeatedly failed to release the cast stone.  *Id.* at 9-10.

   3. Analysis

Section 30 of the Agreement provides, in relevant part, that:

> If at any time [Titan]
>  (a) fails or refuses to supply sufficient labor, materials, tools, equipment or supervision;
>  (b) fails or refuses to perform the Work promptly and diligently;
>  (c) fails to meet the Project Schedule;
>  (d) causes delay, interference or stops the work of Hunt or any other contractors or subcontractors;
>  (e) fails or refuses to perform any of its obligations under this [Agreement] or the Contract Documents; or
>  (f) becomes bankrupt, insolvent or goes into liquidation . . .
>
> then in any of such events . . . Hunt shall have the right . . .
>
>  (2) to delay payment of all or part of the [Agreement] Price until [Titan] conforms to the Project Schedule; and/or
>  (3) to take over and perform through itself or through others [Titan's] Work until, in Hunt's sole judgment, [Titan's] default has been cured . . .
>  (5) to terminate all or any portion of [Titan's] right to proceed under the [Agreement] and to enter upon the premises . . . . . In case of such termination of the employment of [Titan], [Titan] shall not be entitled to receive any further payment under the [Agreement] with respect to such portion of the Work until that portion of the Work shall be wholly completed to the satisfaction of Hunt, the Owner and the Designer and shall have been acepted by them, at which time, if the unpaid balance of the amount to be paid under this [Agreement] shall exceed the cost and expense incurred by Hunt in completing said portion of

> the Work, such excess shall be paid by Hunt to [Titan] as
> set forth below; but if such cost and expense shall exceed
> such unpaid balance, then [Titan] shall pay the difference to
> Hunt as set forth below . . . .

Hunt Ex. 125, at § 30.1.

The Court will address in Sections C, D and E below the issue of whether Hunt

improperly induced performance on Titan's part.  At this juncture, however, the Court need only

focus on one issue -- whether Titan's behavior justified termination under Section 30.  Having

reviewed the evidence presented at trial, the Court holds that it did.   Titan does not appear to

dispute that it diverted the cast stone delivered by ACS for delivery to Titan's facility, instead of

the Project.  Tr. V. 8 (Jeff) 206:22-207:1.   It also appears beyond contention that Hunt sent two

letters to Titan requesting that it release the material, and notifying Titan that failure to do so

would amount to a material breach.  Hunt Ex. 611, 626; Tr. V. 17 (AK) 68:11-71:8; Tr. V. 8

(Jeff) 207:4-21. When Titan refused to release the cast stone, it failed to comply with its

obligations under the Agreement, allowing  Hunt to terminate all or any portion of Titan's right to

proceed under the Agreement.

## C.    Whether Hunt Breached the Implied Covenant of Good Faith and Fair Dealing

Titan claims to have proven at trial that Hunt breached the implied covenant of good faith

and fair dealing and was thus in breach of the Agreement.   The Court disagrees.[3]

Under New Jersey law, "[e]very party to a contract . . . is bound by a duty of good faith

_____

[3]      The Court will apply New Jersey law to all claims, as mandated under Section
34.1 of the Agreement.  *See* Hunt Ex. 125, at § 34.1 ("This [Agreement] shall be
governed by and construed in accordance with the law of the State in which the Project is
located.").

and fair dealing in both the performance and enforcement of the contract." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210 (2005), *citing Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 241 (2001).  The implied duty of good faith and fair dealing requires that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the full fruits of the contract . . . ." *R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co.*, 168 N.J. 255, 277 (2001), *quoting Assoc. Group Life, Inc. v. Catholic War Vet.*, 61 N.J. 150, 153 (1972).  "[G]ood faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with justified expectations of the other party." *Elliot & Frantz, Inc. v. Ingersoll-Rand Co.*, 457 F.3d 312, 329 (3d Cir. 2006), *quoting Gaydos*, at 277. "A plaintiff may be entitled to relief in an action under the covenant if the defendant acts with ill motives and without any legitimate purpose to destroy the plaintiff's reasonable expectations."  *Elliott*, 457 F.3d at 329, *citing Wilson*, 168 N.J. at 250-51 (2001).  However, "bad motive or intention is essential, and an allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent improper motive."  *Elliott*, at 329, *quoting Wilson*, at 251.

> 1.    Titan's Arguments

Titan claims to have established at trial that Hunt improperly induced it to complete the fabrication, delivery, erection and alignment work by:

> A. Repeatedly promising to pay $330,000 on Titan's December pay application when it had no intent to do so;

> B. Feigning agreement to Murray's proposal that a payment be made to Titan, Titan complete its work and that a subsequent meeting be held on 6/15/05 to attempt to resolve the remaining

issues between Hunt and Titan; and

C. Requesting that Titan submit to Hunt its claim for the work it
had done as a ruse designed to [convince Titan that] a settlement
was possible and have Titan continue, through Phoenix, to perform
handset work at the Project.

Titan Br. ¶ 168.  Titan claims in particular that it was deceived because Hunt failed to advise

Titan or IFIC that it was considering hiring Sabia in early February 2005,  *id.* at ¶¶ 181-82, and

because it instructed IFIC that "it had not received a written proposal from Sabia when in fact it

had received written proposals on 2/15/05 and 4/15/05."  *Id.* at ¶ 185. Titan adds that Hunt also

acted in bad faith by only making payment by joint checks to those entities whose work was

necessary to complete the manufacture, delivery, erection and alignment of the panels," and by

suggesting to Mr. Giorgio that Hunt was charging all project delays to Titan whether or not they

were attributable to Titan.  *Id.* at ¶¶ 169, 172.  Titan concludes that Hunt's behavior amounted to

a breach of the Agreement's implied covenant of good faith and fair dealing.

> 2.    Hunt's Arguments

Hunt responds, however, that Tital failed to carry its burden of proving the breach of said

covenant, and that Titan's claims of inducement are misplaced. Hunt Reply at 10.  Hunt notes

that Titan failed to deliver the remaining panels as promised upon receipt of Hunt's February 3,

2005 letter, and that Hunt learned "of additional supplier claims between the time it wrote [said]

letter and the time it received payment from the Owner."  *Id.* at 11.  Hunt adds that under Section

5.11 of the Agreement, "payment by joint check is at Hunt's discretion," and that Titan's

argument that Hunt acted in bad faith when it chose to use payment by joint checks only in

connection with entities working in connection with the panels is simply groundless.  *Id.* at 11-

32

12.

        3.     Analysis

Having reviewed the evidence introduced at trial, the Court concludes that Hunt did not

breach the Agreement's implied covenant of good faith and fair dealing.  Hunt had no obligation

to notify Titan that it was considering Sabia to replace Phoenix on the Project.  In addition,

credible information was offered at trial that Titan did not complete the promised job on time,

*see* Titan Ex. 80, and that Hunt was informed after sending the letter to Titan of other supplier

claims against Titan for which it might become liable.  Tr. V. 20 (LW) 203:18-205:6.  Having

failed to meet its end of the bargain struck at the beginning of February, Titan cannot fault Hunt

for contracting with Sabia.  Under the circumstances, the Court finds that Hunt did not act with

ill motives and without any legitimate purpose to destroy Titan's reasonable expectations.

Accordingly, Hunt did not breach the implied covenant of good faith and fair dealing.

    **D.**    **Whether Hunt Anticipatorily Repudiated the Agreement**

Titan claims to have proven at trial that Hunt anticipatorily repudiated the Agreement.

Once again, the Court disagrees with Titan's characterization of the evidence. "An anticipatory

breach is a definite and unconditional declaration by a party to an executory contract -- through

word or conduct -- that he will not or cannot render the agreed upon performance." *Ross Systems*

*v. Linden Dari-Delite, Inc.*, 35 N.J. 329, 340-41 (1961), *citing*, *inter alia*, *Miller & Sons Bakery*

*Co. v. Selikowitz*, 8 N.J. Super. 118 (N.J. Super. Ct. App. Div. 1950). "If the breach is material,

i.e., goes to the essence of the contract, the non-breaching party may treat the contract as

terminated and refuse to render continued performance." *Ross*, at 341, *citing* 6 CORBIN,

CONTRACTS, § 1253 (1951).

Titan's claim is groundless in light of this Court's findings.  Titan breached the Agreement by failing to perform on schedule, and Hunt -- in response to that breach -- terminated Titan. Hunt cannot be faulted for seeking to minimize the impact of a likely (and imminent) change in personel by contacting potential replacements prior to the actual termination.  Anticipatory repudiation is simply inapplicable under these circumstances.

    **E.**    **Whether Hunt's Actions Amounted to Fraud**

Titan also claims that Hunt's actions in obtaining performance from Titan while allegedly contemplating the replacement of Phoenix with Sabia constitutes fraud. The Court disagrees.

New Jersey courts hold that:

> proof of common law fraud requires the satisfaction of five elements: a material misrepresentation by the defendant of a presently existing fact or past fact; knowledge or belief by the defendant of its falsity; an intent that the plaintiff rely on the statement; reasonable reliance by the plaintiff; and resulting damages to the plaintiff.

*Liberty Mut. Ins. Co. v. Land*, 186 N.J. 163, 175 (2006), *citing Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997).

As discussed above, credible evidence was introduced at trial to support the contention that Hunt and Titan agreed upon a delivery date for the remaining panels, but that the subsequent failure on Titan's part to comply with that deadline and the information relating to potential supplier liens against Titan contributed to Hunt's decision to terminate its subcontractor.  Under the circumstances, Hunt cannot be deemed to have defrauded Titan.  Once Titan violated the parties' understanding, Hunt was under no obligation to retain Titan and Phoenix.  Hunt's

contacts with Sabia prior to the actual termination date was nothing more than an attempt to protect itself from the impact of a likely imminent breach by Titan.

    **F.    Whether Hunt Failed to Pay Titan in Connection With Certain Payment Applications and RCOs**

Titan claims that it is owed money by Hunt for work performed on the Project. Indeed, Titan suggests that it submitted 16 payment applications to Hunt for the Project, but was paid in full for only 12 of them. Titan Br. ¶ 199. According to Titan, Debbie Luciano testified that:

- Titan submitted application number 13 on December 15, 2004.

- Titan submitted pencil copy payment application number 14 on January 19, 2005.

- Titan submitted pencil copy application number 15 on February 25, 2005.

- Titan submitted pencil copy application number 16 on March 17, 2005.

Titan Br. ¶¶ 200-03, *citing* Tr. V. 5 (DL) 28:25-29:12, 32:23-33:21, 34:6-35:4, 35:5-14, 36:5-19. Titan claims that application number 13 was approved by Hunt, but paid only in part, and that applications 14 through 16 were neither approved nor rejected by Hunt.

Titan contends that "[t]he work performed by Titan as reflected in its payment applications #14, #15, and #16 was incorporated by Hunt into its payment applications to [the Owner], and paid to Hunt by [the Owner]." Titan Br. ¶ 206. In addition, Titan claims that "Hunt requested Titan to perform additional work at the Project for which Titan submitted [Requests for Change Orders]", but that "[o]ther than Titan's first 2 RCOs, Hunt failed to review or respond to Titan's RCOs while Titan was working on the Project." *Id.* ¶¶ 208-09. Titan argues that Debbie Luciano's testimony and the documents introduced at trial prove that Hunt was paid for Titan RCOs, yet never paid Titan for them. *Id.* ¶¶ 211-13. Titan concludes that "[t]he total

35

amount of Titan's outstanding payment applications, RCOs and retainage is $1,659,457.17." *Id.* ¶ 213.

Hunt responds that the evidence introduced at trial showed that Hunt simply refused to approve Titan's pencil payment applications 14-16 because "Titan had not completed as much work as Titan claimed to have finished." Hunt Reply at 13. Hunt maintains that "[n]othing in the [Agreement] or the parties' dealings required Hunt to approve Titan's inflated payment applications." *Id.* Moreover, Hunt dismisses Titan's claims that it impermissibly received payment from the Owner for Titan's work in connection with the aforementioned RCOs and payment applications. Indeed, Hunt argues that the backcharges incurred by Hunt for Titan "offset any payments otherwise due Titan under the [Agreement]." *Id.* According to Hunt, "Section 5.6 of the [Agreement] entitled Hunt to withhold payments from Titan under those circumstances." *Id.*

Having reviewed the evidence introduced at trial, the Court finds that Mr. Weisman convincingly established that Titan simply had not completed the work for which it requested payment in applications 14, 15 and 16. *See* Tr. V. 20 (LW) 81:25-82:10. Under the circumstances, Hunt was under no obligation to approve the payment applications, and did not have to pay Titan in connection with those payment applications. As for Titan's claim that it is entitled to payment for all RCOs on the Project, the Court will reserve judgment on that issue of fact until receipt of the party submissions requested under Section I below. Indeed, the Court holds that if the amount owed by Titan to Hunt for backcharges outweighs any payment obligation by Hunt to Titan, that issue may be mooted.

36

### G.    Whether Hunt May Claim Against IFIC Under the Performance Bond

1.    Hunt's Argument**s**

Hunt claims to have established at trial that IFIC is "independently liable for breach of its bond obligation to Hunt" and that the Court "may award damages against IFIC for its own breaches of contract up to and including nearly all of Hunt's counterclaim damages."  Hunt Br. at 33.

Hunt contends that the IFIC performance and payment bonds incorporated the Agreement, and that "Titan's duties and obligations under [the Agreement] were part of IFIC's performance bond obligations to Hunt."  *Id.*  Hunt argues that "IFIC's duty arises at the time of a declaration of default by the obligee, Hunt," and that "[a] default under this particular bond can be declared without a termination."  *Id.* at 34.  According to Hunt, the testimony of Mr. Whelan, Mr. Kobayashi and Mr. Vaughn establishes that Hunt issued five declarations of default to Titan, and that IFIC was copied on each of those declarations.  *Id.*, *citing* Hunt Ex. 1015-19.

Hunt submits to the Court that IFIC nonetheless failed to investigate the matter in order to assess its obligations under the bond until March 24, 2005.  Hunt Br. at 35.  Indeed, Hunt claims to have proved at trial that IFIC:

> (a) did not visit the Project site,
> (b) did not obtain and review Titan's files,
> (c) did not make a formal request for Hunt's documents,
> (d) did not retain a surety consultant,
> (e) did not send a surety consultant to the site to commence a surety investigation, and
> (f) did not even confer with anyone from Hunt until after March 24, 2005.

Hunt Br. at 35.

37

Mr. Whelan testified that IFIC relied instead solely on information from Titan that the default issue had been resolved.  *Id.*  According to Hunt, the testimony of Mr. Whelan and Mr. Sullivan also proves that Hunt only requested documents from Hunt on March 31, 2005 and did not retain a surety consultant -- Mr. Sullivan -- until April 11, 2005.  *Id.*  Hunt suggests that IFIC was aware that Titan had placed Hunt in the difficult position of having to make up for Titan's delays to avoid liquidated damages, and that IFIC "understood it could enter into a takeover agreement with Hunt, put its chosen replacement contractor in place, and reserve its rights as to the propriety of the termination."  *Id.* at 36.  According to Mr. Whelan, IFIC nonetheless failed to take over.  *Id.*

Hunt dismisses IFIC's defense that it was discharged from its bond obligations to Hunt. Indeed, Hunt claims that the testimony of Mr. Whelan and Mr. Kobayashi establishes that Mr. Sullivan was given full and complete access to all personnel and documents, and adds that Mr. Sullivan himself confirmed that the only impediment he encountered was a refusal by Hunt to make photocopies of relevant documents on his behalf.  *Id.* at 36-37.  Tr. V. 12 (JS) 23:25-24:14; Tr. V. 13 (JS) 133:12-24;  Tr. V. 17 (AK) 76:12-79:10; Tr. V. 10 (FW) 116:2-119:16.  Hunt maintains that Mr. Sullivan was free to have any document he desired sent out for copying, and that Hunt's refusal to copy said documents for him did not amount to a deliberate impediment of IFIC's investigation.  *Id.* at 37.

Moreover, Hunt rejects IFIC's claim that it was released from its obligations under the bond when Hunt hired Sabia.  Hunt claims that "[t]he bond language allows Hunt to complete the subcontractor's work," and that "[n]othing in the bond language relieves IFIC from completing its

38

investigation simply because Hunt elected to move forward with Sabia under ¶ 2 of the bond."
*Id.*, *citing* Tr. V. 10 (FW) 72:18-73:19; 112:9-13.  Hunt adds that "IFIC did not allay Hunt's
concerns" about Phoenix's ability to complete its work on schedule, and that "IFIC never objected
to Hunt's going forward with Sabia."  Hunt Br. at 38.

In fact, Hunt argues that it was justified in moving forward with Sabia rather than
Phoenix, and that IFIC has failed to live up to its obligations under the surety bond.  Hunt claims
that Phoenix had refused to increase its workforce on the Project, and had "made virtually no
progress on the hand set work from November 2004 to March 2005".  Hunt Br. at 37-38.  In
addition, Hunt contends that "neither Titan nor IFIC ever provided Phoenix's work scope to
Hunt." *Id.* at 38.  As a result, Hunt interpreted Phoenix's proposal of $590,000 and 45 days to
complete the handset work as excluding the additional handset work required for the panels
delivered without brick and cast stone. *Id.* at 38.

Hunt adds that IFIC not only breached its obligation to Titan under the Agreement, but
also breached its independent obligation to Hunt by failing to obtain Titan's accounting records
and failing to assess the contract balance, even though IFIC "owed a duty to Hunt under ¶ 3 of
the bond form to review its principal's accounting records and make a determination of the
contract balance available to complete Titan's scope of work." *Id.* at 39, *citing* Hunt Ex. 45.
Hunt claims to have shown that IFIC decided to join forces with Titan against Hunt after a July
2005 meeting -- shortly after Titan initiated the lawsuit against Hunt.  Hunt Br. at 39.  Hunt
argues that this was a *de facto* determination, under the surety Agreement, that the termination
was improper. *Id.* at 39.  Hunt concludes that since "IFIC did not complete its independent

investigation and did not know whether its principal or its obligee had defaulted under the

[Agreement], its decision to choose its principal's side in the litigation was a breach of its

separate duty to Hunt to independently determine the propriety of the default termination."  *Id.* at

40.

　　　　　2.　　IFIC's Arguments

IFIC disputes Hunt's characterization of the facts and maintains that IFIC was not

properly apprised of the events that led to Titan's termination.  Indeed, IFIC contends that Hunt

only selectively copied IFIC on letters to Titan regarding job-related issues from November 2004

to March 2005, Titan Br. ¶ 223, and in fact "made it a regular practice of not sending copies to

IFIC of any correspondence in which Hunt was acknowledging that it owed money to Titan . . . ."

*Id.* at ¶ 225.  According to Mr. Whelan, Hunt only sent a letter to IFIC giving notice that it was

declaring Titan in default in connection with the Performance Bond on March 22, 2005.  *Id.* at ¶

226, *citing* Tr. V. 10 (FW) 30:12-31:1.

Moreover, IFIC argues that Hunt deliberately impeded IFIC's attempt to investigate the

matter.  Mr. Whelan testified that he wrote to Hunt on March 31, 2005 to request information

necessary for IFIC's investigation, and had contacts with at least 6 Hunt employees or agents.

Titan Br. at ¶¶ 228-29, *citing* Tr. V. 10 (FW) 31:9-34:1.  Mr. Pienknagura allegedly informed Mr.

Whelan at that time "that copying the information that Mr. Whelan requested to conduct his

investigation would pose an undue burden on Hunt, take unnecessary time, and impose

unreasonable expense."  *Id.* at ¶ 230.  IFIC submits that Whelan responded by letter dated April

12, 2005 that failure on Hunt's part to provide the requested information would prevent any

investigation by IFIC.  *Id.* at ¶ 231.  According to IFIC, this warning was in vain.  Indeed, Titan

contends that Mr. Sullivan was given some documents by Mr. Kobayashi, but "did not receive

the bulk of the . . . documents from Hunt until May 12, 2005 . . . ."  *Id.* at ¶ 233.

Finally, IFIC claims that IFIC was discharged of its obligations under the bond when

Hunt hired Sabia.  IFIC submits that neither Mr. Whelan nor IFIC authorized Sabia to be the

replacement for Phoenix.  *Id.* at ¶ 234.

   3. Analysis

The performance bond at issue states, in relevant part:

> Whenever [Titan] shall be, and be declared by [Hunt] to be in
> default under the [Agreement], [Hunt] having performed [Hunt's]
> obligations thereunder:
>
> (1) [IFIC] may promptly remedy the default subject to the
> provisions of paragraph 3 herein, or:
>
> (2) [Hunt] after reasonable notice to [IFIC] may, or [IFIC] upon
> demand of [Hunt], may arrange for the performance of [Titan's]
> obligation under the [Agreement] subject to the provisions of
> paragraph 3 herein;
>
> (3) The balance of the [Agreement] price, as defined below, shall
> be credited against the reasonable cost of completing performance
> of the [Agreement].  If completed by [Hunt], and the reasonable
> cost exceeds the balance of the [Agreement] price, [IFIC] shall pay
> to [Hunt] such excess, but in no event shall the aggregate liability
> of [IFIC] exceed the amount of this bond.  If [IFIC] arranges
> completion or remedies the default, that portion of the balance of
> the [Agreement] price as may be required to complete the
> [Agreement] or remedy the default and to reimburse [IFIC] for its
> outlays shall be paid to [IFIC] at the times and in the mannner as
> said sums would have been payable to [Titan Stone] had there been
> no default under the [Agreement].  The term "balance of the
> [Agreement] price", as used in this paragraph, shall mean the total
> amount payable by [Hunt] to [Titan] under the [Agreement] and

> any amendments thereto, less the amounts heretofore properly paid
> by [Hunt] under the [Agreement].

Hunt Ex. 45.

Having reviewed the evidence introduced by the parties at trial, the Court finds that IFIC is liable to Hunt under the performance bond for Titan's breach.  The clear meaning of the bond language establishes that Hunt was only required, under Section (2), to provide reasonable notice of Titan's default to IFIC.  Such notice was given.  Indeed, credible evidence was introduced at trial that Hunt issued five declarations of default to Titan - on which IFIC was copied - between January 17, 2005 and February 9, 2005.  Tr. V. 10 (FW) 97:23-106:11.

The Court is not convinced by IFIC's argument that its obligation was discharged when Hunt hired Sabia.  There is no language to that effect in the bond agreement, and the Court will not read any such release into the document.  *Lawson v. Fortis Ins. Co.*, 301 F.3d 159, 162 (3d Cir. 2002) ("Straightforward language in an insurance policy should be given its natural meaning. In keeping with the rule of contra proferentem, however, ambiguous terms should be strictly construed against the insurer.").  The Court also rejects IFIC's argument that it is freed from any obligations it may have had under the bond because of Hunt's failure to cooperate adequately with IFIC.  The correspondence between Hunt and IFIC clearly establishes that IFIC had access to all documents and personel.  Tr. V. 10 (FW) 116:2-117:24; Tr. V. 12 (JS) 23:25-24:14; Tr. V. 17 (AK) 76:12-79:10; Hunt Ex. 658.  The refusal to make photocopies for Mr. Sullivan -- when he was given the opportunity to arrange for photocopies of relevant documents to be made -- does not constitute an undue impediment to IFIC's investigation.  *See* Tr. V. 13 (JS) 133:12-24; Tr. V. 10 (FW) 116:2-119:16.  Accordingly, the Court finds IFIC liable for Titan's default under

42

the performance bond.[4]  Whether IFIC needs to disburse any funds to Hunt will of course

depends on this Court's forthcoming decision on damages, as explained in Section I below.

### H.   Whether Hunt's Backcharges Are Proper

#### 1.   Titan's Arguments

Titan maintains that many of Hunt's backcharges are inappropriate.  First, Titan claims to

have proven through Mr. Sullivan's testimony that the acceleration backcharges (those that relate

to work peformed to accelerate the Project) were improper "because Titan was not the cause of

the delay on the Project which initiated the inside-out construction of the building or necessitated

the acceleration of the interior trades."  Titan Br. ¶ 241.

Second, Titan claims that the temporary utility backcharges (relating to temporary heat,

electricity and rainwater piping) were improper "because the Contract Documents . . . required

that Hunt provide temporary services and utilities on the Project for use by all subcontractors."

*Id.*  As for the temporary enclosure backcharges, Titan claims that Mr. Sullivan's testimony

proved that they were not warranted because "Hunt's decision to apply a temporary enclosure to

the building was not due to the timing of Titan's arrival on the Project site, [but was instead

merely] an attempt by Hunt to make up for previous delays."  *Id.*

Third, Titan argues that the termination cost backcharges were improper "because Titan

was wrongfully terminated by Hunt, and Titan should have been permitted to complete its work

---

[4]       The Court notes that Hunt appears to request an additional $1,329,819.42 from
IFIC for an alleged breach of its independent duty to Hunt under the bond.  Hunt Br. at
40.  The Court does not read the plain language of the bond to provide for such relief.
Moreover, since the Court has already held that it would hold IFIC responsible for Titan's
damages due to Hunt, the assessment of further damages against IFIC seems inconsistent
with this Court's notions of equity.

under the [Agreement]." *Id.* Finally, Titan objects to many of the individual backcharges. *Id.* at ¶ 242. Indeed:

- Titan suggests that Hunt impermissibly imposed a 21% mark-up on the backcharges relating to acceleration, temporary utilities and temporary enclosures. *Id.*

- Titan claims that it was backcharged for work relating to Change Order No. 3 -- work that was never performed. *Id.*

- Titan argues that "Hunt overstated the amount of the backcharges, by using the same backup documentation . . . for different backcharges." *Id.*

- Titan submits that "Hunt charged Titan to accelerate work that was not delayed on the Project but was actually performed at a time when Hunt's schedules anticipated that it would be performed." *Id.*

- Titan claims that the installation of a temporary protection on the EPDM roof was necessary and was contemplated by Hunt before any claim that Titan's work was late. *Id.*

- Titan submits that "Hunt charged Titan for another subcontractor's alleged cost increases due to delays in April '04, months before any claim that Titan's work was late." *Id.*

- Titan contends that "Hunt charged Titan for another subcontractor's increased insurance costs." *Id.*

- Titan claims that "Hunt charged Titan for damage to a fence in June '06,

44

over a year after Titan was terminated and when Titan was not on site."

*Id.*

2.      Hunt's Arguments

Hunt claims that both Mr. Kobayashi and Mr. Vaughn confirmed that Hunt informed

Titan of these backcharges contemporaneously, and did not, as Titan alleges, "make them up"

after the fact.  Hunt Br. at 10.  According to Mr. Boland, these backcharges fall into two basic

categories: (1) "backcharges related to Hunt's efforts to mitigate project delays caused by Titan;"

and (2) "backcharges related to completing and correcting Titan's work."  *Id.*  Hunt maintains that

these backcharges were reasonable and proper under the Agreement.

a.      Delay Backcharges

First, Hunt contends that since Titan failed to erect the panels as scheduled, Hunt was

forced to erect a temporary enclosure to heat the interior of the building and allow the interior

trades to proceed.  *Id.* at 11.  Mr. Boland and Mr. Ericson explained that these temporary

enclosures provided less insulation and therefore drove up the costs of heating the building.  *Id.*

Hunt submits that it properly backcharged Titan for these costs.  *Id.*

Second, Hunt claims to have shown at trial that "[o]ther delay backcharges were due to

damage to other work left exposed when Titan failed to complete its work as scheduled."  *Id.*  For

example, Hunt alleges that it had to fireproof part of the building a second time because  the

delays caused by Titan had forced Hunt to leave the building exposed to the weather, damaging

the earlier fireproofing work. Tr. V. 17 (AK) 16:7-14.

Third, Hunt contends that the testimony of Mr. Kobayashi establishes that some

45

contractors were unable to start their work even with the temporary enclosures.  Hunt was

therefore forced to shorten their work duration and pay them overtime.  *Id.* at 11-12.  Hunt

submits that Titan should properly be held responsible for those added costs.

> b.    Completion and Correction Backcharges

In addition to the delay backcharges outlined above, Hunt claims that it is entitled to the

backcharges relating to the completion and correction of Titan's work.   Indeed, Hunt argues that

the testimony of Mr. Weisman, Mr. Sabia and Mr. Boland proves that Hunt ultimately paid Sabia

$888,381 to complete the handset brick and cast stone work that Titan should have finished -- an

amount $58,381 higher than Titan's original scheduled amount of $830,000.  *Id.* at 12.

Moreover, Hunt argues that it has shown through the testimony of Mr. Weisman that it faced

increased construction costs because Titan held cast stone in its facility and failed to notify Hunt

of this fact or produce the stone to Hunt upon request.  *Id.*  at 13.  Finally, Hunt explains that the

testimony of Mr. Kobayashi, Mr. Vaughn and Mr. Weisman establishes that Hunt had to incur

additional expenses to protect the EPDM roof.  *Id.* at 13.  Indeed, Hunt suggests that it had to

install the EPDM roof before the synthetic slate roof because of Titan's delays.  *Id.*  Hunt had

originally planned to finish the EPDM roof last to avoid having workers cause damage to it

during the installation of the slate roof.

> c.    Structural Steel Remediation Backcharges

Hunt argues that it is also entitled to the backcharges it submitted against Titan for

structural steel remediation.  Hunt claims to have established at trial that Titan's panels were

designed too large, and that Hunt had to ask the Engineer to issue a fix.  *Id.*  Once the Engineer

designed the fix (and after Hunt bought the material necessary to implement the fix) Titan allegedly issued its own fix, ignoring the Engineer's recommendations. *Id.* at 13-14. According to Mr. Kobayashi, Hunt was then unable to use the material it had bought. *Id.* at 14, *citing* Tr. V. 17 (AK) 21:10-26:22.

In addition, Hunt argues that it proved through the testimony of Mr. Kilsheimer and Mr. Ericson that Titan had erred in cutting off the W-12 beams without requesting permission to do so. *Id.* Hunt adds that in spite of having been reprimanded for these actions, Titan then did the same thing on the other side of the building. *Id.* Hunt contends that it is entitled to backcharge Titan for the costs associated with its actions.

> d.     Lack of Persuasive Expert Testimony to Rebut Hunt's Backcharges

Hunt submits to the Court that it is entitled to all of the backcharges that it presented to the Court for the reasons stated above, but also because Mr. Sullivan's short attempted rebuttal of Hunt's backcharges was unpersuasive. First, Hunt contends that Mr. Sullivan failed to address the 30(b)(6) deposition testimony of Mr. Kobayashi and Mr. Weisman in his expert report. *Id.* In fact, Hunt argues that the opinions expressed by Mr. Sullivan at trial are of little value in that they do not take into consideration the rationale for the backcharges set out in those depositions. *Id.* at 15.

Second, Hunt argues that "Titan never established Mr. Sullivan's qualifications to testify about construction claims or damages." *Id.* Indeed, Hunt claims that "Titan [only] offered Mr. Sullivan as an expert in 'construction scheduling, delay analysis, and commercial construction issues.'" *Id.*

e.      Individual Backcharges

Hunt acknowledges Titan's objections to the individual backcharges, but rejects them all. Hunt submits that under Section 30.1(5) of the Agreement it is entitled to a 21% markup in case of termination by Titan.  Hunt Reply at 14.  Hunt notes that the Agreement provides that in case of breach on Titan's part, "if [Hunt's] costs plus overhead of ten percent (10%) and profit of ten percent (10%) exceeds the unpaid balance, then [Titan] shall pay the difference to Hunt within ten (10) days of written demand by Hunt."  Hunt Ex. 125, § 30.1(5).

In addition, Hunt contends that Mr. Sullivan's opinion with respect to the roof-related backcharges is flawed because of his alleged failure to consider Hunt's rationale for the roof decking.  Hunt Br. at 15.  Indeed, Hunt submits that "Larry Weisman explained that if Hunt had done that, it would have cost Hunt more money and the manufacturer would have voided the warranty."  *Id.*

Hunt also dismisses Titan's contention that many of the backcharges are improper because they relate to the acceleration of work that was actually performed at a time when Hunt's schedules anticipated that it would be performed.   Indeed, Hunt argues that Mr. Sullivan's testimony on this issue should be disregarded as he relied on electronic schedules that were never used on the Project.  *Id*. at 16.

3.      Analysis

Under Section 5.6 of the Agreement, "Hunt may deduct from any payment due [to Titan], any costs incurred by Hunt which are chargeable to [Titan]."  Hunt Ex. 125, at § 5.6.   The Court will address each category of backcharges before addressing Titan's objections to the individual

48

backcharges.

           a.      Temporary Enclosure, Temporary Heat and Additional Labor Costs

The Court notes that the General Conditions of Hunt's agreement with the Owner state that Hunt:

> shall provide such temporary electricity, water, and other utilities which are necessary to perform the work, or which may be required by supplemental general conditions. [Hunt] shall also supply such temporary enclosures and heat which are necessary to perform the work or which may be required by the supplemental general conditions.

Hunt Ex. 6, at TCNJ 0030073. This language does not, however, exonerate Titan from liability for the temporary enclosure and temporary heat costs set out in Hunt's backcharges. The plain meaning of the General Conditions is that Hunt may be held responsible for any delays or increased costs caused by any failure on its part to properly enclose and heat the building for the subcontractors. It does not mean that Hunt should be made to shoulder the increased cost of heating the building resulting from one of its subcontractors' failure to adhere to an agreed-upon work schedule.

This Court determined above that Titan and Hunt willingly entered into the Agreement, and agreed upon a timetable for the installation of the Wall System. Titan failed to comply with the timetable, which lead to foreseeable increases in the cost of heating and enclosure for Hunt, as well as increases in the labor costs as Hunt had to pay follow-on contractors for overtime to make up for the delay. Under Section 32.1 of the Agreement, Titan "shall be liable to Hunt for all damages . . . for delays caused in whole or in part by [Titan] . . . ." Hunt Ex. 125, at § 32.1. Titan is therefore liable for Hunt's extra costs. *See* Tr. V. 17 (AK) 15:6-23; Tr. V. 22 (JB)

102:3-107:8.

              b.        Roof Sequence and Handset Completion Backcharges

Similarly, credible evidence was introduced at trial that Hunt incurred additional

expenses in attempting to protect the EPDM roof.  The Court finds that if Titan had performed its

work as scheduled, Hunt would have been able to install the perimeter roof and not been

compelled to install protection for the EPDM roof.  *See* Tr. V. 25 (AK) 40:24-51:12; Tr. V. 19

(TV) 65:17-21.  Moreover, Hunt presented compelling evidence that Titan was responsible for

the failure to complete the handset work, and that Hunt was forced to have the job completed by

Sabia at a slightly greater cost.  Tr. V. 20 (LW) 103:12-104:23, Tr. V. 16 (NS) 46:12-56:10.

Under Section 32.1 of the Agreement, Titan must therefore be held liable for the roof

backcharges, and the additional cost of handset completion.

              c.        Structural Steel Remediation Backcharges

The Court finds credible the evidence introduced at trial establishing that Titan's failure to

comply with the Engineer's fix (a fix designed to remedy Titan's own manufacturing error) led to

Hunt buying material that was eventually left unused.  Tr. V. 17 (AK) 21:16-26:22; Tr. V. 21

(KCE) 124:21-126:20.  Titan is therefore liable for the backcharges relating to that material.  In

addition, the Court finds that the evidence introduced at trial establishes that Titan can properly

be held liable for cutting off the W-12 beams without seeking permission from Hunt.

              d.        Individual Backcharges

The backcharges requested by Hunt include a 21% markup on all acceleration, temporary

utilities and temporary enclosures backcharges.  Hunt Reply at 14-15.  The Court notes that

Section 30.1(5) of the Agreement confirms that when the costs incurred by Hunt plus an overheard of 10% and profit of 10% exceed the unpaid balance of the Agreement, Hunt is entitled to the difference.  The language of the Agreement does not, however, mandate that the additive steps be undertaken sequentially (i.e., calculating the 10% profit margin on the basis of cost plus overhead, leading to a 21% markup).  The Court reads the Agreement to entitle Hunt only to costs plus 20% of costs.

Next, the Court must reject Titan's request that some of the backcharges be denied on the grounds that they relate to work that was performed as scheduled.  The Court is persuaded by Mr. Boland's testimony to the effect that the electronic schedules upon which Mr. Sullivan and Titan relied in reaching that opinion are not relevant because they were not used to schedule the Project.  Hunt Br. at 16; Tr. V. 22 (CB) 78:21-79:15; Tr. V. 16 (AK) 138:4-140:23.

The Court, however, finds that Hunt has failed to properly address Titan's objections to the individual backcharges.  While Mr. Sullivan appears to have specifically addressed each backcharge, the Court was provided with only a cursory review by Mr. Boland and Mr. Kilsheimer at trial.[5]  Indeed, Mr. Sullivan specifically testified that the backcharges relating to Change Order No. 3 were inappropriate because there was no documentary backup for the charge, and that it appeared from the record that the work at issue was never performed.  Tr. V. 23 (JS) 171:18-172:3.  Mr. Sullivan added that:

- Backcharge Number 45 was a duplicate of backcharge No. 37.  *Id.* at 188:10-12.

---

[5]    The Court rejects Hunt's claim that Mr. Sullivan was not qualified to testify on the issue of backcharges.  Titan offered Mr. Sullivan as an expert in construction scheduling, delay analysis and commercial construction issues.  The issue of backcharges related to delays on a construction site falls squarely within his area of expertise.

- The back-up documentation for backcharge No. 58 had already been used for another backcharge. *Id.* at 192:14-193:7.

- Backcharge No. 73 was a duplicate of backcharge No. 61. *Id.* at 197:11-17.

- Backcharge No. 74 was a partial duplicate of backcharge No. 58. *Id.* at 197:18-198:3.

- Backcharge No. 91 was a partial duplicate of backcharge No. 87. *Id.* at 203:25-204:9.

Similarly, Mr. Sullivan testified that Titan-caused delays were only partially to blame for the roofer's need to buy additional insurance while working on the roof of the building in April 2004. *Id.* at 193:8-25. Mr. Sullivan concluded that backcharge No. 60 was therefore improper.

Next, Mr. Sullivan suggested that "Hunt charged Titan for another subcontractor's alleged cost increases due to delays in April '04, months before any claim that Titan's work was late." Titan Br. ¶ 242. He testified at trial that:

> [backcharge t]wenty-five is identified by the subcontractor who asked for the increase as an increase due to cost from 2003 to 2004[, and that] Titan had no involvement with any work on the project during 2003 and the beginning of 2004. The documents provided by several of the suppliers . . . identified the price increase was as of, I believe it was April of 2004. And Titan wasn't anywhere near the project as far as the site goes, in April of 2004.

Tr. V. 23 (CB) 182:5-12.

Finally, Mr. Sullivan testified that backcharge 97 was improper because it related to damaged fencing when there was no evidence in the documentation that the damage had been inflicted by Titan. *Id.* at 206:22-207:11.

In response to these specific claims, Mr. Boland merely testified on behalf of Hunt that he "reviewed [the backcharges] and determined that by and large, with some certain exceptions and adjustments that were made in [his] reports, both of them, that they were reasonable and chargeable back to Titan based on Titan's failure to perform its contract obligations."  Boland Tr. V. 22 (CB) 52:25-53:5.  As for Mr. Kilsheimer, he addressed only the broad categories of backcharges.  Tr. V. 22 (KCE) 108:15-111:25.

The Court acknowledges that Hunt's experts may have addressed the backcharges in detail in their expert reports.  None of those reports, however, have been admitted into evidence.  Ruling only on the basis of the evidence that can be taken into consideration by this Court, we find that Hunt has failed to establish that it is entitled to backcharges No. 45, 58, 73, 74, 91, 60, 25 and 97.[6]

---

[6]     On a related issue, the Court notes Titan's objection to having the full amount of the backcharges apportioned to them.  Section 32.1 of the Agreement states that:

> [Titan] shall be liable to Hunt for all damages, including any liquidated damages payable to the Owner for delays caused in whoe or in part by [Titan or Titan's] employees . . . . In addition to such damages assessed against Hunt by Owner, [Titan] also shall be liable for all other accrual damages to Hunt caused or contributed to by delays caused in whole or in part by [Titan or Titan's] employees . . . . In the event damages incurred by Hunt are caused both by [Titan] and another entity for whose acts [Titan] is not liable, Hunt shall have the right to reasonably apportion said damages among the responsible parties, and such apportionment shall be binding on [Titan].

Hunt Ex. 125, § 32.  Having reviewed the backcharges we approved above, the Court finds that none appears to unreasonably hold Titan responsible for delays caused by other parties.  The Court therefore finds Hunt's apportionment to be appropriate.

I.      **Damages**

Having ruled upon the parties' substantive claims, it is incumbent upon the Court to assess the implications of its decisions on the issue of damages.  The Court finds that further briefing on the issue would be desirable.  Accordingly, the Court hereby orders the parties to submit briefs detailing -- consistent with this Court's instant Findings of Fact and Conclusions of Law -- the damages to be awarded to each side, if any.

J.      **Titan's Claims of Conversion and Violation of the New Jersey Trust Fund Act**

The Court notes that "[c]onversion consists of the wrongful exercise of dominion and control over property owned by another inconsistent with the owners' rights." *Port-O-San  Corp. v. Teamsters Local Union No. 863 Welfare & Pension Funds*, 363 N.J. Super. 431, 440 (N.J. Super. Ct. App. Div. 2003), *quoting Commercial Ins. Co. of Newark v. Apgar*, 111 N.J. Super. 108, 114-15 (N.J. Super. Ct. Law Div. 1970).  Moreover, the New Jersey Trust Fund Act, provides, in relevant part that:

> [a]ll money paid by the state of New Jersey or by any agency, commission or department thereof, or by any county, municipality or school district in the state, to any person pursuant to the provisions of any contract for any public improvement made between any such person and the state or any agency, commission or department thereof, or any county, municipality or school district in the state, shall constitute a trust fund in the hands of such person as such contractor, until all claims for labor, materials and other charges incurred in connection with the performance of such contract shall have been fully paid.

N.J. Stat. § 2A:44-148.

Under Section 5.6 of the Agreement, "Hunt may deduct from any payment due [to Titan],

any costs incurred by Hunt which are chargeable to [Titan]." *See* Hunt Ex. 125, at § 5.6.  If the

Court ultimately holds that Titan owes Hunt money, it will be unable to recover against Hunt

under these claims.  That decision will only be reached once the Court has had the opportunity to

review the party submissions requested in Section I above.  The Court will therefore reserve

judgment on Titan's conversion and New Jersey Trust Fund Act claims until the issue of damages

has been resolved.

###### K.      Attorneys' Fees

The Court notes that both parties have moved for attorneys' fees.  Under the Agreement,

> Should any dispute between Hunt and [Titan] proceed to
> arbitration or to court, that forum shall award to the previling party
> all of its attorney's fees, disbursements or costs as defined in
> Section 33.6 incurred in connection with the prosecution or
> defense of the dispute.

Hunt Ex. 125, at § 34.4.  While the Court recognizes that New Jersey law has a strong policy

disfavoring the shifting of attorneys' fees, it is well settled that courts will enforce contractual fee

shifting provisions. *North Bergen Rex Transport, Inc. v. Trailer Leasing Co.*, 158 N.J. 561,

569-70 (1999); *Community Realty Management, Inc. v. Harris*, 155 N.J. 212, 234 (1998).

"However, even where attorney-fee shifting is controlled by contractual provisions, courts will

strictly construe that provision in light of the general policy disfavoring the award of attorneys'

fees. *McGuire v. Jersey City*, 125 N.J. 310, 326-27 (1991).

As explained above, this Court will not rule fully on both  parties' requests for damages

until further submissions are received by the Court.  Accordingly, determining which party in this

litigation has "prevailed" under Section 34.4 would be premature at this point.  Nevertheless, the

Court notes the disturbing failure on the part of both parties to submit reasonably detailed evidence of their attorneys' fees.  Accordingly, the Court will dismiss both parties' motions for attorneys' fees, without prejudice to further submissions within 20 days.

## IV.    CONCLUSION

On the basis of the evidence introduced at trial, the Court finds that Titan is responsible for the delays in setting up its Wall System.  Its excuses in this regard are groundless.  In light of said delays, Hunt's termination of Titan was proper.  Hunt did not breach the Agreement's implied covenant of good faith and fair dealing, did not fraudulently induce Titan to perform work on the Project, and did anticipatorily repudiate the Agreement.  Under the circumstances, IFIC can be held liable under the surety bond for any amount owed by Titan to Hunt.

The Court has ruled above on the propriety of Hunt's backcharges.  The Court now requests that the parties submit, within 20 days of the date of this Opinion, detailed breakdowns of the damages at issue in the case at bar.  The Court directs the parties to ensure that such additional submissions are consistent with this Court's instant Findings of Fact and Conclusions of Law, and are not seen as an opportunity to reargue that which has already been decided.   The Court will then rule on Titan's conversion and New Jersey Trust Fund Act  claims, and on the damages to be assessed, if any, against each party.

Finally, the Court denies both parties' motions for attorneys' fees without prejudice to their right to refile amended motions within 20 days of the date of this Opinion.  An appropriate form of Order accompanies these Findings of Fact and Conclusions of Law.


Dated : October 30, 2007


    s/ Garrett E. Brown, Jr.

GARRETT E. BROWN, JR., U.S.D.J.